1  BAO M. VU (SB #277970)
   bao.vu@stoel.com
2  THOMAS A. WOODS (SB #210050)
   thomas.woods@stoel.com
3  ANDREW H. MORTON (*pro hac vice pending*)
   andrew.morton@stoel.com
4  STOEL RIVES LLP
   500 Capitol Mall, Suite 1600
5  Sacramento, CA 95814
   Telephone: 916.447.0700
6  Facsimile: 916.447.4781

7  *Proposed Counsel for Debtor and*
   *Debtor in Possession*

8
                    UNITED STATES BANKRUPTCY COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10
                    SAN FRANCISCO DIVISION
11

| In re: | Case No. 20-30383 |
|---|---|
| CROSSCODE, INC., | Chapter 11 |
| Debtor. | DECLARATION OF GREG WUNDERLE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS |

I, Greg Wunderle, hereby declare under penalty of perjury:

1.      I am the interim CEO and member of the Board of Directors of Crosscode, Inc. (the "***Debtor***," "***Company***," or "***Crosscode***"),[1] a corporation organized under the laws of the state of Delaware and the debtor and debtor in possession in the above-captioned chapter 11 case (the "***Chapter 11 Case***"). In these capacities, I am familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records, and I am authorized to make this Declaration on behalf of the Debtor.

2.      I joined Crosscode as Vice President of Sales and Chief Revenue Officer on October 1, 2019. On November 13, 2019, I was appointed Interim CEO by Crosscode's Board of Directors. Throughout my 30-year career in technology, I held various leadership positions with

---

[1]     The last four digits of the Debtor's federal tax identification number are 9980. The Debtor's address is 950 Tower Lane, Suite 2100, Foster City, CA 94404.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

companies including PeopleSoft, Klockwork, UrbanCode, and, most recently, IBM. While at UrbanCode, I was Vice President of Sales and helped grow the Company from under $2 million in annual revenues to being acquired by IBM in less than five years. I remained with IBM until October 2019, serving as Worldwide Sales Leader and Worldwide Offering Manager for the IBM UrbanCode brand.

3.     I received a Bachelor of Science in Business Administration from the University of Akron in 1983. Additionally, in 2008, I was ordained as a Permanent Deacon for the Diocese of Cleveland, where I serve in this capacity for St. Andrew the Apostle Church in Norton, Ohio.

4.     I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of: (a) the Debtor's petition for relief under chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") filed on May 5, 2020 (the "***Petition Date***"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "***First Day Motions***").

5.     To familiarize the Court with the Debtor, the purpose of initiating this Chapter 11 Case, and the relief that the Debtor will seek in connection with this Chapter 11 Case, this Declaration is organized in five parts. Part I provides an introduction to the Debtor and information on the Debtor's business operations. Part II provides an overview of the Debtor's organizational and capital structure. Part III describes the circumstances leading to the commencement of this Chapter 11 Case. Part IV describes the Debtor's chapter 11 goals. Part V sets forth additional relevant facts in support of each of the First Day Motions filed in connection with this Chapter 11 Case.

## I.     THE DEBTOR'S BUSINESS

6.     Crosscode was founded in 2015. Over the last five years, it has developed patented, cloud-based information technology ("***IT***") mapping software that mitigates the costs and risks of making IT changes by automating key analytical processes. Crosscode is still in the pre-revenue stages of its development and is actively working to develop, improve, and refine its products while it continues to develop strong relationships with potential partners and clients.

Stoel Rives LLP
Attorneys At Law
Sacramento

105990370.7 0072141-00002

Case: 20-30383    Doc# 7    Filed: 05/05/20    Entered: 05/05/20 22:08:19    Page 2 of 21

7.      Crosscode's software creates a highly effective medium that provides a map of the interdependent impact changes to business processes resulting from a change to a line of software code. Businesses often spend an inordinate amount of time trying to determine the extent and impact of such changes on their business processes, applications, and data and IT assets. Crosscode's software simplifies the process of determining how changes to code in one area reverberate throughout its clients' data and IT systems.

8.      To this end, Crosscode offers a suite of patented software tools, one of which is its "***Dependency Analyzer***," which maps all of the applications and databases in an enterprise at the code level and creates a detailed dependency map. The Dependency Analyzer also allows clients to engage in hypothetical analysis to assess the potential effect of enterprise changes to systems in advance of implementation. The current version of Crosscode also includes the following modules:

- **Enterprise Decomposition Modeler.** Decomposes each application to the code levels to determine which piece of application or database "talks" to which code and field across the enterprise.

- **Enterprise Impact Assessment Analyzer.** Supports both creating "what if" scenarios during planning sessions, as well as creating a detailed project "punch list" for making any approved changes. Submitting a change via this module will generate analysis at the code level across the enterprise.

- **Governance Operating System.** Allows users to define governance frameworks and rules to block vulnerabilities in the systems during the development process and ensures the developers follow the defined frameworks and rules defined by the organizations.

9.      Together, Crosscode's products create a system snapshot that reveals:

- Unpatched vulnerabilities;

- Undocumented business workflows and information sharing;

- Legacy system artifacts and dependencies;

- Shadow IT applications; and

- Third-party components.

Case: 20-30383    Doc# 7    Filed: 05/05/20    Entered: 05/05/20 22:08:19    Page 3 of 21

This information is presented in a dashboard that covers multiple platforms, programming languages, and databases, providing the detailed, granular analysis of dependencies necessary to ensure the smooth implementation of systemic changes.

10.    Crosscode's software is unique to the market. I am not aware of any other solution that provides a complete map of dependencies at the enterprise-wide level. The software provides managers with empirical risk data associated with changes to technology, which enhances users' ability to efficiently and cost-effectively implement system-wide changes. Crosscode's target market for its software includes software startup companies because of their immediate need for its products.

11.    Crosscode currently has its headquarters in Foster City, California, and maintains a second office in New York City, New York. Accordingly, Crosscode leases offices in Foster City and New York City. Crosscode has 13 full-time employees and two independent contractor employees. Employees are geographically dispersed across the country, with most working from their homes.

12.    The Company does not currently have any paying customers or revenues. So far in 2020, the Company has monthly operating expenses of approximately $500,000, of which approximately $200,000 are extraordinary legal expenses due to the misconduct of our former CEO, Aditya Sharma ("*Sharma*"). The Company is currently engaging with trial customers and expects to have revenue by the fourth quarter of 2020.

## II.    THE DEBTOR'S ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    The Debtor's Prepetition Organizational Structure

13.    The Debtor is a corporation organized under the laws of the state of Delaware. As a venture-capital-backed, pre-revenue startup company, Crosscode has no corporate owners or affiliates.

14.    The Debtor's Board of Directors currently has six members: Robert Clifford (chairman), Ankur Desai, Keith Archer, Greg Wunderle, Soumik Sarkar, and Rahul Gandhi.

Stoel Rives LLP
Attorneys At Law
Sacramento

WUNDERLE DECLARATION                     -4-
105990370.7 0072141-00002

Case: 20-30383    Doc# 7    Filed: 05/05/20    Entered: 05/05/20 22:08:19    Page 4 of 21

## B. The Debtor's Prepetition Capital Structure

15.     As of the Petition Date, Crosscode's only outstanding secured indebtedness was under a series of Crosscode, Inc. Senior Secured Promissory Notes made between April 19 and April 20, 2020, in the aggregate principal amount of $244,600 (collectively, the "***Bridge Notes***").[2] The Bridge Notes are secured by first position liens, perfected by the filing of a uniform commercial code-1 (UCC-1) financing statement with the Delaware Secretary of State, in all of Crosscode's assets.

16.     Crosscode's primary source of outstanding unsecured indebtedness comprises relatively modest debts incurred or owing in the ordinary course of the Debtor's business. These include approximately $422,342.59 owed to fewer than 10 services vendors, of which the largest, R Systems, is owed approximately $201,073. Crosscode's outstanding tax obligations are also modest. Shortly before the Petition Date, the Debtor received an estimated statement of 2019 taxes due to the Delaware Division of Corporations in the approximate amount of $277,116.60. The Debtor disputes the amount, which appears to have been incorrectly calculated and is overstated by more than one order of magnitude. Additionally, Crosscode is in ongoing negotiations with a former employee seeking cash severance in the approximate amount of $208,000.

17.     As discussed below, Crosscode also had significant unliquidated and related liabilities arising from or related to Mr. Sharma's misconduct. Additionally, as also discussed below, Mr. Sharma and his wife have each asserted claims against Crosscode, all of which Crosscode believes are meritless.

18.     Crosscode is currently authorized to issue two classes of capital stock, designated as common stock and Series A Preferred Stock. As of May 1, 2020, there were 4,000,000 shares of common stock outstanding and 4,312,000 shares of Series A Preferred Stock issued or outstanding. As of the same date, there were 271,200 shares of common stock available for purchase as options, 600,000 shares held in a common stock reserve on behalf of Crosscode's stock incentive plan, and warrants entitling holders to the purchase of 400,000 shares of common stock and 370,000 of Series

---

[2]     As discussed below, Crosscode entered into the Bridge Notes in order to maintain sufficient cash reserves until it could file this Chapter 11 Case and obtain postpetition financing.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

WUNDERLE DECLARATION

-5-

105990370.7 0072141-00002

A Preferred Stock. The three largest holders of Crosscode's Series A Preferred Stock are Peter A. Appel (10.4%), Valley High Limited Partnership (10.4%), and Erick Richardson (4.2%). The three largest holders of Crosscode's common stock are Sharma (60.5%), Soumik Sarkar (18.2%), and Mahmood Khan (10.0%). Additionally, Crosscode's former CEO, Sharma, claims he holds an additional 367,179 shares of common stock and options to purchase an additional 260,000 shares of common stock—Sharma's claims are disputed by Crosscode.

## III.  EVENTS LEADING TO CHAPTER 11 FILING

19.  Crosscode largely remains in the pre-revenue stages of its development as it continues to improve its products and seek appropriate markets for the same. Accordingly, Crosscode has limited revenue and relies on venture capital investment to sustain itself as it develops. Crosscode operates on a tight budget tailored to meet its month-to-month operational expenses but has a limited capacity to pay any additional, unexpected expenses.

### A.  Sharma's Detrimental Misconduct as the Debtor's Chief Executive

20.  In May 2019, Crosscode closed a Series A Preferred Stock offering (the "*Offering*"). The Offering was supported by information contained in a Private Placement Memorandum ("*PPM*"), the content of which was directed and determined by Sharma in his role as CEO at the time of the Offering. The Offering was conducted through a placement agent National Securities Corporation ("*NSC*") and its affiliate Liquid Venture Partners ("*LVP*"), a collection of registered representatives of NSC.

21.  The Offering culminated with the Debtor and the buyers of the Series A Preferred Stock entering into a Securities Purchase Agreement (the "*SPA*"). The SPA contained numerous representations and warranties, including representations that the PPM and all other information provided by the Debtor to the buyers of the Series A did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading. Sharma, on two separate occasions, certified that each and every representation and warranty of the Company set forth in the SPA was true and correct.

22.  Crosscode raised $9.25 million in gross proceeds through the Offering. $219,000 of that amount was used to pay off notes made by Crosscode in favor of Sharma and his wife, Dr.

Stoel Rives LLP
Attorneys At Law
Sacramento

105990370.7 0072141-00002

Anshu Sharma. In addition, rather than requiring repayment of an additional $375,000 in notes made by Crosscode in favor of Sharma, Sharma elected to convert that amount due into Series A Preferred Stock. At the closing of the Offering, Sharma owned roughly 33% of Crosscode's stock on an as-converted basis (including common and preferred stock and not accounting for the accrual of preferred dividends that dilute his percentage of ownership).

23.     After the Offering closed, Crosscode's Board of Directors was composed of Sharma, Ankur Desai (a principal of LVP), and Miles Everson (the "**_Previous BOD_**"). Robert Clifford and Daniel Landry, each a principal of LVP, became Board observers at that time.

24.     Shortly after the Offering closed, certain members of the Previous BOD became concerned with Sharma's performance. Those members determined that a number of the requirements set forth in the SPA had not been met, placing Crosscode in default of that agreement.

25.     For example, after the Offering closed, the Company was required pursuant to the SPA to timely engage an independent auditor to complete the 2018 year-end audit. The SPA also required the Company to provide LVP with monthly and quarterly financial statements. Sharma, as CEO, failed to comply with those requirements. Certain members of the Previous BOD also grew concerned about Sharma's truthfulness, particularly regarding the Company's pipeline of customers.

26.     On November 7, 2019, Miles Everson resigned from the Previous BOD, leaving Ankur Desai and Sharma as the lone remaining directors.

27.     On November 13, 2019, a majority of Crosscode's outstanding capital stockholders voted to remove Sharma as Chairman of the Board of Directors. By the same shareholder action, Robert Clifford, Rahul Gandhi, Keith Archer, and Soumik Sarkar joined the Board. The Board then consisted of these individuals and Ankur Desai. The Board promptly terminated Sharma as CEO and President for cause, citing numerous performance failures, including the failures to comply with the covenants of the SPA described above.

28.     After Sharma's removal, the Board of Directors appointed me as Interim CEO and Rahul Gandhi as Interim Chief Financial Officer ("**_CFO_**"). Drawing on his previous experience

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

as a hedge fund professional and business strategy consultant, Mr. Gandhi thoroughly reviewed Crosscode's financial condition and other Company records, including certain financial information and other due diligence provided by Sharma as part of the Offering. The Debtor also retained experienced counsel to assist with its investigation.

29.     The Debtor has determined that Sharma made numerous misstatements in connection with the Offering and in the PPM. For example, in the PPM, the Company, through Sharma, represented that Crosscode had $675,000 of cash bookings in the quarter ending December 31, 2018 based on existing customer contracts. Sharma provided copies of these same purported customer contracts to LVP during due diligence. The Debtor has determined that 90% of Crosscode's "bookings" were based on contracts that had been fraudulently fabricated by Sharma. The Debtor has also determined that Sharma took steps to ensure that the fabricated contracts would not be discovered by LVP or any employee, officer, or director of the Debtor.

30.     The Debtor has also determined that Sharma misrepresented the details of Crosscode's equity structure during the Offering by failing to disclose an accurate and complete list of all of Crosscode's stockholders. Specifically, during due diligence, Sharma provided LVP with a list of Crosscode stockholders that was supposed to be current as of March 13, 2019. That list did not identify common shares representing more than 5% of the then-outstanding shares of Crosscode that he had apparently granted to at least two individuals—individuals who provided "customer references" during LVP's due diligence in the Offering. The stock grants to these two individuals were not disclosed in the PPM or the related due diligence materials, nor were they disclosed to anyone else prior to the completion of the Offering.

31.     By way of another example, the Debtor determined that Sharma altered and fabricated Crosscode records in an attempt to increase his ownership of Crosscode stock. Specifically, the Debtor determined that Sharma fabricated a March 2019 Board resolution granting him 10 million shares of common stock (pre-split). The fabricated resolution contained the digital signatures of the other two Board members at the time—both of those individuals have denied ever approving such a resolution. The Debtor also determined that Sharma altered a shareholder list from the Company's transfer agent, making it appear as if he had indeed been

Case: 20-30383   Doc# 7   Filed: 05/05/20   Entered: 05/05/20 22:08:19   Page 8 of 21

granted those 10 million shares of common stock. The purported 10 million shares of common stock (pre-split) supposedly granted to Sharma were not disclosed in the PPM or the related due diligence materials.

### B. Events Subsequent to Sharma's Termination

32.     Since his termination, Sharma has taken aggressive actions in an attempt to reclaim his role at Crosscode at significant cost and to the detriment of the Debtor. The day after he was terminated, Sharma threatened to broadcast to all shareholders his accusations that LVP and the Previous BOD had committed securities fraud in connection with the Offering. He was immediately informed, with supporting documentation, that his accusations were false.

33.     Nevertheless, the next day, on November 15, 2019, Sharma emailed all of Crosscode's stockholders and employees suggesting that LVP and the Previous BOD had committed securities fraud in connection with the Offering—a knowingly false allegation that he, after being threatened with litigation from LVP, publicly and completely recanted on December 22, 2019. Sharma's false claims regarding LVP have negatively impacted the Debtor. Among other things, LVP has demanded that it be indemnified by the Debtor for the legal expenses it incurred in defending against Sharma's false claims of securities fraud. LVP has asserted that the Debtor must indemnify it for these expenses pursuant to an agreement entered into between NSC and the Debtor as part of the Offering, and is claiming that, at present, the Debtor owes it $138,805 pursuant to that indemnification agreement.

34.     On December 23, 2019, the day after Sharma recanted his allegations regarding LVP, Sharma claimed that he was the owner of Crosscode's intellectual property pursuant to a purported intellectual property license agreement between him and Crosscode ("***Purported License Agreement***"). Sharma attempted to hold Crosscode hostage by suggesting he would terminate or suspend Crosscode's use of the license unless he was reinstated as Crosscode's Chairman and CEO. Sharma also threatened to start another company using Crosscode's technology if he were not reinstated.

Case: 20-30383   Doc# 7   Filed: 05/05/20   Entered: 05/05/20 22:08:19   Page 9 of 21

35.     Crosscode has determined that the Purported License Agreement was yet another document fabricated by Sharma, and as discussed below, two federal courts have reached similar conclusions.

36.     On January 3, 2020, Crosscode filed litigation against Sharma in the United States District Court for the Northern District of California seeking a declaration that the Purported License Agreement is null and void (Case No. 3:20-cv-00104-VC) (the "*California Action*"). Crosscode also seeks damages related to Mr. Sharma's attempted enforcement of the Purported License Agreement and other post-termination wrongful conduct, including defamation, trade secret theft, breach of Mr. Sharma's employment agreement, and intentional interference with Crosscode's business and investor relations.

37.     On March 3, 2020, Judge Chhabria issued a preliminary injunction in the California Action precluding Sharma from invoking the Purported License Agreement during the pendency of the litigation, holding that Crosscode is likely to succeed on its claim "because the record strongly indicates that the licensing agreement is fabricated" and because the agreement, even if it were not fabricated, is likely unenforceable. Sharma has since answered the amended complaint in the California Action, and has asserted counterclaims for declaratory relief regarding his removal from Crosscode's Board of Directors and claims seeking to recover monies he supposedly lent to Crosscode pursuant to a purported oral contract he entered into with Crosscode in 2016. The Debtor has answered the counterclaims and disputes that Sharma's removal was improper, that such an oral contract ever existed, or that Crosscode owes Sharma anything. Judge Chhabria has scheduled a hearing on Crosscode's to-be-filed motion for terminating sanctions based on Sharma's litigation conduct for June 26, 2020.

38.     Prior to the Court in the California Action entering the preliminary injunction, Sharma and his wife, Dr. Anshu Sharma, initiated an action against Crosscode and certain members of Crosscode's current Board of Directors in the United States District Court for the District of Minnesota (Case No. 20-cv-00436 PJS/TNL). Sharma also sought declaratory and injunctive relief regarding the Purported License Agreement and alleged harassment. The Court in that action entered an order denying the Sharmas' request for a preliminary injunction regarding alleged

Case: 20-30383   Doc# 7   Filed: 05/05/20   Entered: 05/05/20 22:08:19   Page 10 of 21

harassment, finding that they were not likely to succeed on the merits of their claim and that the evidence they offered in support of the purported harassment was "exceedingly shaky" and appeared to be fabricated. The Court also noted that the Purported License Agreement may be fabricated as well. The Court ultimately dismissed all of Sharma's claims without prejudice. Dr. Sharma chose to dismiss her claims without prejudice as well.

39.     On April 9, 2020, Dr. Anshu Sharma served a lawsuit to be filed in Minnesota state court claiming Crosscode defaulted on several loans she purportedly made to Crosscode. That action was filed on April 22, 2020 and was removed to the U.S. District Court for the District of Minnesota on April 29, 2020 (Case No. 0:20-cv-01042-DSD-BRT). Crosscode believes Dr. Sharma's claims are meritless as well.

40.     Sharma continues to rely on fabricated documents in an effort to reclaim his position on Crosscode's Board and as CEO. On April 17, 2020, Sharma sent letters and notices to the current Board of Directors, claiming that the requisite holders of the Company's stock, by written consent, had removed Messieurs Archer, Clifford, Desai, Gandhi, and Sarkar from the Board, and that he was reappointed as a director and the Company's CEO. He also claimed that two other individuals were appointed to the Board by these written consents, that I was asked to step down as President and Interim CEO and resume my original position as Senior Vice President and Head of Sales, reporting to him, and that Crosscode counsel was terminated. Crosscode obtained these purported written consents, and determined that Sharma's actions were based on at least one forged written consent, that one of the individuals who supposedly was appointed to the Board did not agree to such an appointment, and that Sharma was continuing to rely on the fabricated Board resolution granting him 10 million (pre-split) shares of common stock.

41.     That next day (at 12:07 a.m.), counsel for Crosscode sent Sharma's counsel information regarding his actions, and in particular, that Sharma was relying on fabricated documents. Thirteen hours later, Sharma's counsel "withdrew" the notice of the removal of the directors, the delivery of the written consents, the election of the purported new directors, and the purported changes in Company management. Sharma's counsel stated that the "withdrawing" of such actions did not constitute an admission.

Stoel Rives LLP
Attorneys At Law
Sacramento

WUNDERLE DECLARATION

-11-

42.     In addition to reputational and goodwill damage, and interference with potential business relationships, Sharma's conduct post-termination has cost the Company significantly. The Company has had to spend more than $500,000 on matters relating to Mr. Sharma's conduct, a significant amount of which has been spent dealing with Mr. Sharma's post-termination conduct. This does not include the amount LVP is claiming for indemnification stemming from Sharma's false accusations regarding alleged securities fraud.

### C.     The Fallout Resulting From Sharma's Misconduct

43.     While Crosscode believes Sharma's claims and the claims of his wife are meritless, the litigation described above is costly. The resulting litigation expenses have imposed a substantial and ongoing hardship on Crosscode that have made it difficult for Crosscode to meet its month-to-month financial obligations and otherwise sustain its operations.

44.     Worse yet, in addition to the litigation costs it is incurring to fend off the Sharmas' wrongful claims and counterclaims, Sharma's conduct also gives rise to the possibility of further harm to Crosscode. Crosscode fears that Sharma's misconduct and misrepresentations during his time with Crosscode may also subject it to future liability and further legal costs related to, among other things, (i) securities claims brought by stockholders and (ii) indemnification claims, including claims for advancement of legal defense costs by Sharma himself, related to the Offering.[3] Unfortunately, if understandably, Crosscode's fears are also shared by prospective equity investors.

45.     Sharma's misconduct has thus made it difficult, if not impossible, for Crosscode to obtain traditional equity financing. I am confident that Crosscode would have been unable to raise capital in a new equity financing. Crosscode would have failed even cursory due diligence and been unable to make standard representations and warranties regarding, among other things: ownership of Crosscode intellectual property; knowledge of wrongdoing by any officers of Crosscode, and ownership of Crosscode itself. But for the Chapter 11 Case, I believe Crosscode lacks the ability to raise additional funding from new or existing investors, who are shaken by the current state of

---

[3]     When we sought directors and officers (D&O) insurance, the initial quote was approximately $10,000 per year. Once we had fully disclosed all the issues related to Sharma, which were excluded from coverage, our quote was over $70,000 per year.

1  capital markets and thus even more wary of investing in Crosscode given the uncertainty and

2  potential legal liabilities created by Sharma.

3      46.    Crosscode investigated the various options available to it and, in consultation with

4  counsel, has determined that pursuing an expedited plan of reorganization under chapter 11,

5  subchapter V, of the Bankruptcy Code provides a path forward for Crosscode to fully and finally

6  resolve the potential liabilities created by Sharma, reorganize its capital structure, and thereby

7  access the additional financing necessary for Crosscode to successfully fund its operations and

8  continue growing into a revenue- and, eventually, profit-generating business.

9      **D.**    **Prepetition Restructuring and DIP Financing Process and Negotiations**

10      47.    For the reasons described above, Crosscode faced unique obstacles to obtaining

11  either prepetition financing (whether to avoid bankruptcy or as a bridge to it) or any form of

12  postpetition financing. We declined to seek traditional bank loans because, at least absent personal

13  guarantees, they are typically not available to startups such as ours with no revenue, no customers,

14  and no hard collateral. Venture debt, which takes the form of a short-term bridge loan right before

15  the closing of a venture-backed equity financing round, was also not a viable option.

16      48.    Lacking the hard assets and revenues otherwise needed to obtain asset-backed

17  bankruptcy financing from traditional lenders, Crosscode turned its existing Series A Preferred

18  stockholders with a proposal to restructure and recapitalize itself through chapter 11 bankruptcy

19  under a plan (the "***Plan***") on pre-negotiated terms and with postpetition financing (the "***DIP***

20  ***Facility***") solicited directly to substantially all Series A Preferred stockholders (collectively, the

21  "***Restructuring***").

22      49.    On March 27, 2020, Crosscode's Board of Directors formed and delegated all

23  authority to a special committee (the "***Special Committee***") comprising Greg Wunderle and Soumik

24  Sarkar—neither of whom hold any interests in the Series A Preferred Stock or would participate in

25  any financing related to the Restructuring—to evaluate, negotiate, and ultimately authorize

26  Crosscode's entry into the financing and other transactions related to the Restructuring, including

27  commencing the Chapter 11 Case. The culmination of the Special Committee's efforts and the terms

28  of the Restructuring are embodied in the (1) Restructuring Support Agreement (the "***RSA***") by and

Case: 20-30383    Doc# 7    Filed: 05/05/20    Entered: 05/05/20 22:08:19    Page 13 of
21

among (a) Crosscode, (b) the DIP Lenders (as defined in the RSA), (c) the Bridge Noteholders (as defined below), and (d) Series A Preferred stockholders who hold, in aggregate, 94.8% of Crosscode's outstanding Series A Preferred Stock; and, inextricably linked to the RSA, (2) the DIP Facility, which is embodied in the DIP Term Sheet (as defined in the RSA).

50. Crosscode recognized that negotiating prepetition and assuring requisite consents postpetition with respect to any postpetition financing or a restructuring plan that would provide new preferred equity rather than cash on account of DIP Lender claims would be unworkable with potentially as many as 170 individual DIP Lenders. Crosscode therefore proposed that a single prospective DIP Lender serve as representative for all of the DIP Lenders, with authority to negotiate and act on their behalf. Crosscode identified Jim Tierney, who agreed to serve as the DIP lender representative (in his capacity as such, the "***DIP Lender Representative***") and obtain separate counsel for such purpose. Crosscode's Special Committee, the DIP Lender Representative, and their respective counsel engaged in arm's-length negotiations over the terms of the Restructuring, including the RSA, the DIP Facility, and related agreements needed to effectuate them.

51. As those negotiations progressed, Crosscode determined that it was at risk of exhausting its remaining cash on hand before being able to complete its marketing and solicitation of the DIP Facility and commence the Chapter 11 Case. Crosscode negotiated with six holders of Series A Preferred Stock (such holders, collectively, the "***Bridge Noteholders***")[4] to advance funds prepetition, which the Bridge Noteholders were otherwise prepared to commit under the DIP Facility, under the Bridge Notes.[5]

52. Like the DIP Facility, the Bridge Notes bear interest at a rate of 10% per annum, which is calculated and added to the outstanding principal balance at the end of each month.

---

[4] The Bridge Noteholders are CFO (and current Board member) Rahul Gandhi, current Board members Robert Clifford, Keith Archer, and Ankur Desai, and Christopher and Karen Jennings (jointly) and Daniel Landry.

[5] Crosscode also explored a loan under the recently authorized Paycheck Protection Program, but determined not to pursue an application, for several reasons. First, it would have been capped at only 2.5 months of payroll (approximately $370,000). Second, due to Crosscode's disbursed ownership, it would have been difficult to determine our eligibility as a result of the Small Business Administration's affiliation rules. Finally, it would also have required us to make or obtain from Sharma representations regarding Sharma's conduct.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

WUNDERLE DECLARATION -14-

105990370.7 0072141-00002

Closing of the Bridge Notes was conditioned on Crosscode receiving subscriptions for the DIP Facility in an aggregate amount not less than $955,400, which Crosscode believed, together with the Bridge Notes, would be the minimum amount of financing necessary to proceed with the Chapter 11 Case. As discussed below, Crosscode obtained well in excess of the minimum required subscriptions for the DIP Facility, causing the Bridge Notes to close and be funded during the week of April 20, 2020. Consistent with their terms and the circumstances under which they were agreed, the Bridge Notes contemplate the parties' intent that they be "rolled up" into the DIP Facility, at which point the Bridge Noteholders would then become DIP Lenders.

### 1. The Restructuring Is Strongly Supported by Crosscode's Investors

53. On April 13, 2020, Crosscode formally launched the marketing of its proposed Restructuring to its 170 Series A Preferred stockholders (and a limited number of additional prospective investors, none of whom ultimately participated).[6] Crosscode asked its Series A Preferred stockholders to (a) subscribe to loan commitments under the DIP Facility, (b) consent to Crosscode borrowing up to $400,000 under the Bridge Notes, and (c) execute the RSA (in respect of their Series A Preferred Stock and, if applicable, as a DIP Lender).

54. Between April 15 and April 17, Crosscode held six video conference presentations for prospective DIP Facility investors. At these investor meetings, I, along with Crosscode's CFO and Chairman of its Board presented and took questions regarding Crosscode's business, its proposed restructuring in chapter 11, and future opportunities for growth. The solicitation was well received with 136 shareholders, comprising approximately 80% of the Series A by number and 81% by shares, electing to participate. Each investor was offered a pro rata allocation of the DIP Facility based on their existing Series A ownership, with an opportunity to subscribe for more or less. There were net oversubscriptions of approximately $1 million, with approximately $500,000 available to allocate from shareholders who declined to participate or subscribed for less than their pro rata

---

[6] For the reasons discussed above, Crosscode chose not to solicit any additional financing or investment from Sharma, who is also a Series A Preferred stockholder.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

share. These oversubscriptions were also allocated pro rata based on existing Series A ownership, resulting in a fully subscribed DIP Facility in the aggregate amount of $2,755,400.

55. The Restructuring was also well received by Series A investors who chose not to subscribe to the DIP Facility. The RSA was executed by 96% of the Series A investors holding, collectively, nearly 95% of the Series A stock.

**2. The RSA Is in the Best Interests of Crosscode and Its Creditors and Stakeholders**

56. As contemplated by the RSA, Crosscode's proposed Plan will provide that the DIP Lenders receive new equity, rather than cash, on account of their claims under the DIP Facility. Consequently, Crosscode must ensure that DIP Lenders will unanimously consent to receive equity, as contemplated by the terms of Restructuring that were negotiated, agreed, and marketed in connection with the DIP Facility. Crosscode therefore required that any subscriber to the DIP Facility execute *both* (a) that certain Lender Representative Agreement dated as of April 17, 2020 by and among Crosscode, the DIP Lender Representative, and the DIP Lenders (the "***DIP Lender Representative Agreement***") and (b) the RSA, both of which were negotiated by Crosscode with the DIP Lender Representative, and both of which were approved by each DIP Lender as part of the Debtor's solicitation of the DIP Facility.

57. Without the RSA and the DIP Lender Representative Agreement, a single holdout DIP Lender could upend the negotiated understanding and expectations of every other DIP Lender, to say nothing of the overwhelming majority of existing Series A Preferred stockholders, including those who declined to participate in the DIP Facility, who also executed the RSA and stand to receive new equity valued at $3 million. Worse, without the RSA to bind DIP Lenders (and existing Series A Preferred stockholders), the Debtor's ability to efficiently manage its Chapter 11 Case, successfully obtain additional post-confirmation equity financing, pay all of its general unsecured creditors in full, and emerge from bankruptcy under a confirmed Plan, all as contemplated by the RSA, would be severely jeopardized. After considering the limited likelihood of success of any other alternatives as of the date hereof, as well as the proposed payment in full of all allowed claims and the creation of new equity interests for the benefit of the Bridge Noteholders and DIP Lenders,

Crosscode determined, based on its fiduciary responsibility and advice of its legal advisors, that the restructuring contemplated by the RSA is in the best interests of the Debtor and its stakeholders.

58. Neither the terms of the Restructuring Term Sheet nor the DIP Facility Term Sheet have been imposed on Crosscode by its stockholders or creditors. To the contrary, both term sheets are the result of the arm's-length negotiations of the parties thereto and the terms described therein are as much to the benefit of Crosscode and its unsecured creditors, employees, and other stakeholders who will continue to benefit from Crosscode's continued operation as a going concern, as to any of the other parties to the RSA. Crosscode took the lead in crafting the terms of the Restructuring and has expended substantial time and effort in negotiating with parties-in-interest to obtain their assent to and support for the Restructuring, including the RSA and the DIP Facility.

59. The assumption of the RSA will secure the foundation for Crosscode's consensual Restructuring and provide Crosscode and all of the parties to the RSA with the benefits of their bargain in the weeks and months prior to and following the Petition Date, including the ability to maximize recoveries to creditors and equity holders through an efficient chapter 11 process.

## IV. CHAPTER 11 GOALS

60. Crosscode has a strong leadership team that is executing a sound business plan built around an innovative and valuable core product. Crosscode has retained, added, and will continue adding talented employees who are creating tremendous business value and opportunity through their work developing Crosscode's products and bringing them to market. Now, with funding commitments to the DIP Facility secured and the overwhelming support of its Series A Preferred stockholders, Crosscode has a legal path forward through chapter 11 to continue operating, grow its business and revenue opportunities, and access capital markets to meet its future financing needs.

61. Without the benefit of the Chapter 11 Case, Crosscode would likely be unable to continue as a going concern and would need to terminate its operations.

62. The filing of this Chapter 11 Case is intended to, among other things, (i) allow Crosscode to obtain further investor funding necessary for Crosscode's ongoing operations during and after the Chapter 11 Case through the DIP Facility and exit financing (collectively, the "*Funding*"), and (ii) eliminate Crosscode's exposure to securities and indemnity claims and

Stoel Rives LLP
ATTORNEYS AT LAW
SACRAMENTO

associated legal costs resulting from Sharma's misconduct. Reorganization will allow Crosscode to restore its access to capital markets and new financing on customary market terms and emerge in a strong operational position after bankruptcy as a result.

63. Following confirmation of the Plan to be proposed on terms materially consistent with the RSA, Crosscode will seek sell an amount of new preferred stock ("***New Preferred Stock***"), on terms substantially similar to that of Crosscode's existing Series A Preferred Stock, in not less than an amount equal to (a) $8 million less (b) the aggregate amount of funds invested through the Bridge Notes and the DIP Facility in order to raise additional capital to fund its operations (and as a condition to the Plan becoming effective). Upon closing and the Plan becoming effective: (unsubordinated) general unsecured creditors will be paid in full; the Bridge Noteholders and the DIP Lenders will receive New Preferred Stock on account of their claims; Crosscode's existing Series A Preferred stockholders will receive, on account of their redemption rights in the approximate aggregate amount of $20 million, new common stock valued at $3 million; all claims or interests junior thereto will receive nothing; and Crosscode's existing common stock will be cancelled.

64. The Chapter 11 Case will allow for the efficient resolution of the legal claims against Crosscode and a smooth process of capital restructuring. It will allow Crosscode to improve its products, build market capabilities, and press forward towards a successful future as a going concern.

## V. SUMMARY OF RELIEF SOUGHT THROUGH FIRST DAY MOTIONS[7]

65. Based on the above, contemporaneously herewith, Crosscode has filed its *Motion of the Debtor for Entry of an Order Authorizing the Debtor's Assumption of the Restructuring Support Agreement* ("***RSA Motion***") and its *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364(c), 364(d), and 507; (II) Authorizing Use of Cash Collateral; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "***DIP Motion***"). In addition, Crosscode has filed several other First Day Motions

---

[7] Capitalized terms in this <u>Part V</u> that are used but not defined in this Declaration have the meaning set forth in the applicable First Day Motion, and each such pleading is incorporated into this Declaration by reference.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

seeking relief that Crosscode believes is critical and necessary for it to operate with minimal disruption and to preserve the value of its assets and business during the Chapter 11 Case. Those motions include:

- *Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs and (II) Authorizing and Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations* (the **"Employee Wage Motion"**);

- *Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to (A) Continue Its Existing Cash Management System; (B) Open and Close Bank Accounts; (C) Maintain Existing Business Forms; and (D) Continue Using Credit Cards; (II) Authorizing Banks to Honor Certain Transfers; (III) Suspending the Requirements of 11 U.S.C. § 345(b); and (IV) Granting Related Relief* (the **"Cash Management Motion"**); and

- *Debtor's Motion to Shorten Time for Notice and Hearing on First Day Motions* (the **"Motion to Shorten Time"**).

I have reviewed the RSA Motion, the DIP Motion, and each of the First Day Motions referenced below. The facts stated in each are true and correct to the best of my knowledge and belief, with appropriate reliance on Crosscode's employees and advisors. The facts set forth in the First Day Motions are incorporated herein in their entirety.

### A. The Employee Wage Motion

66. The Debtor seeks to eliminate any personal hardship to its Employees (as defined in the Employee Wage Motion) as a result of the filing of this Chapter 11 Case and to minimize the disruption to the Debtor's efforts to reorganize its operations, consistent with the Plan. As of the Petition Date, certain of the Debtor's prepetition obligations to its Employees or other third parties (collectively, the **"Prepetition Workforce Obligations"**), remain unpaid or not yet provided because, among other things: (a) the Debtor commenced this Chapter 11 Case in the beginning of a payroll period and payroll is paid in arrears; (b) checks previously issued on account of employee and independent contractor obligations may not have been presented for payment or may not have cleared the banking system; (c) amounts related to prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtor; and (d) amounts deducted from Employee paychecks were not then due to be paid over to the intended recipient or account,

including (i) deductions taken from Employees' pay checks to make payments on behalf of the Employees for or with respect to the Debtor's Employee Benefit Programs or amounts due to third parties in connection therewith, and (ii) withholdings from Employees' pay checks on account of various federal, state, or local income, state disability, unemployment, and other taxes for remittance to the appropriate federal, state, or local taxing authority.

67. By the Employee Wage Motion, the Debtor seeks authority to pay or provide as they become due all Prepetition Workforce Obligations and the related administrative fees that have already accrued. The Debtor is also seeking authority to honor and continue benefit programs for its Employees. In light of the importance of the Employees to the Debtor's business, I respectfully submit, on behalf of the Debtor, that the relief requested in the Employee Wage Motion is essential and should be granted.

**B.    The Cash Management Motion**

68. The Debtor needs to maintain its current bank accounts with Wells Fargo and Silicon Valley Bank to continue to make ordinary course disbursements, including payment of payroll obligations, to collect customer receipts, and other obligations.

69. More specifically, in the Cash Management Motion, the Debtor seeks authorization (1) to maintain its existing bank accounts and to pay any prepetition banking fees imposed by the financial institution where the Debtor's bank account is maintained, if any; (2) to continue to use its existing business forms and checks; (3) to continue to use its existing cash management system; (4) continue using its credit card system; and (5) to waive, on an interim basis, the deposit and investment guidelines imposed by section 345(b) of the Bankruptcy Code.

70. The relief requested in the Cash Management Motion is essential to facilitate the orderly operation of the Debtor's business and reorganization process. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**C.    The Motion to Shorten Time**

71. Due to the urgency of the actions the Debtor proposes to take pursuant to the other First Day Motions, the Debtor has also filed its Motion to Shorten Time. In the absence of prompt hearings on each of the First Day Motions, the Debtor will be hindered in its ability to pay its

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

Case: 20-30383    Doc# 7    Filed: 05/05/20    Entered: 05/05/20 22:08:19    Page 20 of 21

1    Employees, conduct its normal financial operations, and otherwise proceed smoothly through its

2    Chapter 11 Case.  Accordingly, the Debtor seeks authority from the Court to have all of the above

3    motions considered on shortened time.

4         Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

5    and correct.

6         EXECUTED this 5th day of May, 2020, at Wadsworth, Ohio.

8                                          By: _/s/ Greg Wunderle_____
                                              Greg Wunderle, CEO

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

WUNDERLE DECLARATION                    -21-

105990370.7 0072141-00002