Peter Jazayeri (SBN 199626)
**JAZ, A PROFESSIONAL LEGAL CORPORATION**
peter@jaz-law.com
1100 Glendon Avenue, Suite 1500
Los Angeles, CA 90025
Telephone: 310.853.2529
Facsimile: 310.388.0664

Jay J. Chung (SBN 181003)
jaychung@lacwkrr.com
**LEE ANAV CHUNG WHITE KIM**
**RUGER & RICHTER LLP**
520 South Grand Avenue, Suite 1070
Los Angeles, CA 90071
Telephone: 213.341.1602
Facsimile: 213.402.8635

Attorneys for CREDITOR ADITYA SHARMA

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 3:20-bk-30383 (DM) |
| CROSSCODE, INC., | Chapter: 11 |
| Debtor. | **CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 362, 363, 364(c), 364(d), AND 507 ET AL.; DECLARATION OF ADITYA SHARMA IN SUPPORT THEREOF** |
| | Date: June 2, 2020<br>Time: 10:30 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 1

II. FACTUAL BACKGROUND ....................................................................... 2

   A. The Debtor and Founder ..................................................................... 2

      1. Overview ................................................................................... 2

      2. The Litigation and Founder's Claims .......................................... 3

      3. The Debtor's Ownership ............................................................ 3

      4. The Insiders' Decision to Strip All The Debtor's Assets, Circumvent the Litigation and File Bankruptcy ........................... 3

      5. The Debtor's Assets and Liabilities ............................................ 4

      6. The Post-Petition Budget and Interim Financing ......................... 5

         a. A Budget with No Revenues and Only Operating Expenses ............... 5

         b. No Attempt To Solicit Alternative Financing ....................... 5

         c. Impermissible Lending Terms ............................................ 6

            i. Unseemly Interest Rates and Fees ........................... 6

            ii. Insufficient Carve Out ........................................... 6

            iii. Overly Generous Collateral Pledge .......................... 7

            iv. Impermissible Involvement In Reorganization ........... 7

            v. Lack of Financial Reporting .................................... 8

            vi. Improper Collateral Waivers ................................... 8

III. ARGUMENT .............................................................................................. 9

   A. The Insider DIP Financing Cannot Meet the Standards for Approval ......................... 9

   B. The Insider DIP Financing Is A *Sub-Rosa* Plan ................................. 12

   C. The Insider DIP Financing Contains Impermissible Terms ..................... 14

      1. High Fees .................................................................................. 14

      2. Insufficient Carve Out ............................................................... 14

      3. Too Much Collateral and Improper Collateral Waivers ............... 15

      4. Overly Broad Indemnity ........................................................... 17

CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

5.  Unwarranted Adequate Protection ................................................................. 17

IV.   CONCLUSION ....................................................................................................... 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case: 20-20001   Doc# 58   Filed: 05/28/20   Entered: 05/28/20 12:05:12   Page 3 of
24

**CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL**

# TABLE OF AUTHORITIES

## CASES

*In re AFCO Enters., Inc.*
   35 B.R. 512 (Bankr. D. Utah 1983) ............................................................................... 16

*In re Ames Department Stores, Inc.*
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ......................................................................... 9, 10

*In re Aqua Associates*
   123 B.R. 192 (Bankr. E.D. Pa. 1991) ........................................................................ 9, 10

*In re Braniff Airways, Inc.*
   700 F.2d 935 (5th Cir. 1983) ......................................................................................... 13

*In re Chevy Devco*
   78 B.R. 585 (Bankr. C.D. Cal. 1987) ............................................................................ 13

*In re Codesco, Inc.*
   18 B.R. 225 (Bankr. S.D.N.Y. 1982) ............................................................................ 16

*In re Cooper Commons, LLC*
   430 F.3d 1215 (9th Cir. 2005) ....................................................................................... 10

*In re Defender Drug Stores, Inc.*
   145 B.R. 312 (B.A.P. 9th Cir. 1992) ....................................................................... 10, 13

*In re Fleetwood Enterprises, Inc.*
   427 B.R. 852, 858 (Bankr. C.D. Cal. 2010) ................................................................... 9

*In re Harbin*
   486 F.3d 510 (9th Cir. 2007) ......................................................................................... 14

*In re Iridium Operating LLC*
   478 F.3d 452 (2d Cir. 2007) .......................................................................................... 13

*In re Lehigh Valley Professional Sports Clubs, Inc.*
   260 B.R. 745 (Bankr. E.D. Pa. 2001) ............................................................................ 17

*In re Los Angeles Dodgers, LLC*
   457 B.R. 308 (Bankr. D. Del. 2011) ........................................................................ 11, 12

*In re Mid-State Raceway, Inc.*
   323 B.R. 40 (Bankr. N.D.N.Y. 2005) ........................................................................ 9, 10

*In re Mosello*
   195 B.R. 277 (Bankr S.D.N.Y. 1996) ........................................................................... 17

*In re Pine Lake Village. Apartment Co.*
   19 B.R. 819 (Bankr. S.D.N.Y. 1982) ............................................................................ 17

*In re R.H. Macy & Co.*
   170 B.R. 69 (Bankr. S.D. N.Y. 1994) ........................................................................... 13

iii

CREDITOR ROGER PA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

Case: 20-20915   Doc# 58   Filed: 05/28/20   Entered: 05/28/20 14:45:12   Page 4 of
24

*In re Roblin Indus., Inc.*
  52 B.R. 241 (Bankr. W.D.N.Y. 1985) ................................................................ 9

*In re Sun Runner Marine, Inc.*
  945 F.2d 1089 (9th Cir. 1991) ...................................................................... 10

*In re Swallen's, Inc.*
  269 B.R. 634 (6th Cir. BAP 2001) ................................................................. 13

*In re Tenney Village Co., Inc.*
  104 B.R. 562 (Bankr. D.N.H. 1989) ..................................................... 9, 10, 12

*In re Texlon Corp.*
  596 F.2d 1092 (2d Cir. 1979) .......................................................................... 9

*In re The Colad Group, Inc.*
  324 B.R. 208 (Bankr. W.D.N.Y. 2005) ......................................................... 16

*In re Visual Indus., Inc.*
  57 F.3d 321 (3d Cir. 1995 ............................................................................. 16

*In re Willingham Invs., Inc.*
  203 B.R. 75 (Bankr. M.D. Tenn. 1996) ......................................................... 16

*In re WorldCom, Inc.*
  304 B.R. 611 (Bankr. S.D.N.Y. 2004) ........................................................... 17

*Kivitz v. CIT Group/Sales Fin., Inc.*
  272 B.R. 332 (D. Md. 2000) .......................................................................... 16

*NLRB v. Bildisco & Bildisco*
  465 U.S. 513 (1984) ...................................................................................... 13

**STATUTES**

11 U.S.C. § 105 ........................................................................................... 1, 19

11 U.S.C. § 362 ........................................................................................... 1, 19

11 U.S.C. § 363 ........................................................................................... 1, 19

11 U.S.C. § 364 ............................................................................................... 2

11 U.S.C. § 364(c) ................................................................................... 1, 9, 19

11 U.S.C. § 364(d) ...................................................................................... 1, 19

11 U.S.C. § 364(d)(1)(A) ................................................................................. 9

11 U.S.C. § 503(b)(1) ...................................................................................... 9

11 U.S.C. § 506(c) ......................................................................................... 16

CREDITOR RODITTA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

11 U.S.C. § 507 .................................................................................................................... 1, 19

11 U.S.C. § 552 ...................................................................................................................... 16

11 U.S.C. § 552(b) ............................................................................................................... 8, 16

CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

Case: 20-30242   Doc# 58   Filed: 05/28/20   Entered: 05/28/20 12:05:12   Page 6 of
24

Creator and equity-holder Aditya Sharma ("Founder") hereby submits his Objection to Crosscode, Inc.'s (the "Debtor") Amended Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364(c), 364(d), and 507; (II) Authorizing Use of Cash Collateral; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief (the "Amended Motion").

## I.    INTRODUCTION

The Amended Motion should be denied for multiple reasons, as it is one strand in a triple helix of illusion designed to ravage the Debtor's assets and improperly transfer them to a select group of insider preferred shareholders, while others are left with nothing.

Before taking a deep dive into the Debtor's strategy, please remember that the Debtor has never generated any revenue. Moreover, the Amended Motion makes clear that the Debtor will not generate any revenue during this case.

The first part of the Debtor's scheme begins with a midnight looting of the Debtor's assets by its insider preferred shareholders. Two weeks before the bankruptcy filing, two of the Debtor's officers granted liens on all of the Debtor's assets to a select group of inside preferred shareholders in exchange for funds to finance this bankruptcy case. This was done without notice or otherwise proper disclosure to the Debtor's common shareholders, who now stand to lose all of their investment in the Debtor. It also appears to have been conducted in violation of Delaware law.

The next part of this improper scheme transpires through a restructuring support agreement ("RSA"), through which these insider preferred shareholders pledge an oath of fealty on a prearranged bankruptcy. Under the RSA, the signatories agree to support a plan of reorganization in which all of the Debtor's common shareholders are wiped out, and the insider preferred shareholders are given new and increased ownership of the Debtor.

Now, the insiders' three-part strategy culminates with a proposed post-petition financing plan, in which 80% of these same insider preferred shareholders stand before this Court asking to be recognized as an independent, arms-length post-petition lender. Having vowed via the RSA to strip the Debtor of all its assets, these insiders submit a post-petition financing agreement littered with exorbitant fees, interest rates, massive professional costs, and super-priority liens. It is deliberately

designed to lure the Debtor inside the slaughterhouse, at which point these insiders can credit-bid and gorge on the Debtor's organs for their sole benefit.

It is a clever strategy. Unfortunately, it has one major problem. It is not permitted under the Bankruptcy Code. The Bankruptcy Code does not allow a group of secured insiders, nominally presenting themselves as a debtor-in-possession and post-petition lender, to loot a Debtor's assets, earn exorbitant fees in the process, and increase their ownership, where they are not supporting a good-faith reorganization, and where they failed to exercise their fiduciary duty to the necessary stakeholders.

As explained in detail below, the financing arrangement does not and cannot satisfy the requirements of Bankruptcy Code section 364 for post-petition financing. It is not being used to finance a reorganization for the benefit of the Debtor's general creditors, but, rather, to encumber all of its assets so as to disincentivize Founder or other disputed creditors from asserting pending claims while ensuring that the insiders prevail through pre-ordained lien transfers.

Furthermore, it is also a *sub rosa* plan, filled with improper milestones and incestuous requirements that place the Debtor in irreparable bondage to its insider lenders. Lastly, the financing is plagued with so many improper terms and conditions that even a Las Vegas pawnshop run by mobsters would be offended. Thus, as detailed below, the Court should deny the Amended Motion.

## II.     FACTUAL BACKGROUND

### A.     The Debtor and Founder

#### 1.     Overview

The Debtor is a non-revenue startup software company that was created in 2015 by Founder. Founder served as its Chief Executive Officer and Chairman of the Board until November 2019. Founder helped Debtor raise $9.3 million through an investment banking group, Liquid Venture Partners ("LVP"), in a series A preferred capital fundraising. Shortly after the financing was obtained, LVP reconstructed the Debtor's board, fired Founder and ousted him from his board membership. (Declaration of Aditya Sharma ("Sharma Decl.") ¶ 2.)

///

///

Case: 20-30819    Doc# 153    Filed: 05/28/20    Entered: 05/28/20 12:15:12    Page 8 of
24

CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

### 2. The Litigation and Founder's Claims

The circumstances of Founder's ouster, along with his claims to ownership of additional company stock, ownership and licensing claims for the Debtor's intellectual property, and repayment of unpaid loans, are currently the subject of contested litigation, pending before the Hon. Vince Chhabria in the Northern District of California, as Case No. 3:20-CV-00104-VC, based on a complaint brought by the Debtor, and a now-stayed cross-complaint filed by Founder (the "District Court Litigation"). (*Id.*) There is also related litigation that was filed in Minnesota, arising out of claims for unpaid loans to the Debtor from Founder's wife (the "Minnesota Litigation, together with the District Court Litigation, the "Litigation"). (*Id.*) Beyond the $1.5 million that is owed to Founder and his wife for unpaid loans, Founder contends that he has unliquidated tort and intellectual property claims which Founder estimates to be worth several million dollars. (*Id.*)

### 3. The Debtor's Ownership

Founder is the single largest shareholder of the Debtor, comprising nearly 60 percent of the common shares. (Sharma Decl. ¶6.) There are approximately 4,000,137 outstanding common shares, 3,850,000 series A preferred shares, and 370,000 warrants on the series A preferred shares. (*Id.*) As such, the Debtor's equity is broken almost equally between the common and preferred shares, slightly in favor of the common. (*Id.*) The preferred shares are held almost entirely by principals of LVP. (*Id.*)

### 4. The Insiders' Decision to Strip All The Debtor's Assets, Circumvent the Litigation and File Bankruptcy

To be clear, this bankruptcy case is very much a two-party dispute between the LVP-led owners of the Debtor's preferred shares and Founder. As set forth in the Wunderlee Decl. ¶¶ 47-53, immediately before the Debtor filed its petition, a special committee consisting of the Debtor's interim CEO and the Debtor's first employee solicited the Debtor's preferred shareholders for a plan to secure all of the Company's assets and use the bankruptcy process to flush away Founder and his claims.

Approximately two weeks before the Debtor filed its petition, the Debtor obtained secured insider financing from six of its preferred shareholders, including the Debtor's current CFO, and five

3

**CREDITOR ROGITA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL**

board members (the "Pre-Petition Insider Bridge Financing"). (Wunderlee Decl. ¶52.) The Pre-Petition Insider Bridge Financing was conditioned on a restructuring support agreement ("RSA") and a subscription for post-petition financing, which was also being funded by a group comprising 80% of the insider preferred shareholders (the "Insider DIP Financing"). Together, the Pre-Petition Insider Bridge Financing would be rolled up with the DIP lending during the reorganization process in an aggregate amount of approximately $3 million. The selected preferred shareholders/insider lenders and the Debtor would be married through the RSA. Prior to this arrangement, the Debtor did not have any secured debt.

By doing this, the Debtor has effectively gamed the new small business bankruptcy rules. It has filed Chapter 11 with zero unencumbered assets and zero revenues (in the past, present or future). It is using the Interim DIP Financing to improve the position of the Pre-Petition Insider Bridge financiers. It has created a pre-ordained mutually-assured destruction pact, in the form of the RSA, in which the Debtor and its preferred shareholders bless the Debtor's chosen unsecured creditors, eliminate the Founder and common shareholders, increase their ownership stake, leave the Debtor without any revenues or runway by confirmation time, while promoting the idea that they can raise exit financing for a bankrupt, non-revenue company in the midst of a global pandemic. Simply put, the Debtor's proposed reorganization idea is a pure canard. Its interim financing is nothing more than a ruse to allow its Interim Pre-Petition Bridge financiers further means to seize the Debtor's assets, increase their ownership, and wipe out the common shareholders.

### 5. The Debtor's Assets and Liabilities

The Debtor admits that it has never had any revenues, does not have any paying customers, and in fact, is not projected to have any revenues throughout the entirety of the 13-week post-petition budget it has submitted. (See Amended Exhibit C to the Motion; Declaration of Greg Wunderle ("Wunderle Decl.") ¶ 12.) Prior to filing its petition, the Debtor was spending nearly 50% of its $500,000 in monthly operating expenses on the Litigation. (Id.)

The Debtor's main asset is its potential intellectual property (the "IP") claims to which are disputed by Founder and are the subject of the Litigation. (Sharma Decl. ¶2.) Besides the IP and the contingent Litigation claims, the Debtor's remaining assets consist of a carry-forward tax loss,

4

approximately $20,000 in computer equipment, a couple of unremarkably small office leases, prepaid book-keeping services, and insurance policies. There is approximately $58,000 in the Debtor's checking account, amounts which were funded as part of the Pre-Petition Insider Bridge Financing.

The Debtor's liabilities consist of secured claims of approximately $250,000 pursuant to the Pre-Petition Insider Bridge Financing. The Debtor's undisputed unsecured debts include approximately $23,000 in wages, $4,000 in taxes, nearly $400,000 owed to vendors and professionals, $138,000 to the insider LVP for costs related to the Litigation, and approximately $5,500 in outstanding credit. The Debtor's disputed claims include $208,000 in employee severance, approximately $1.5 million from the Founder and his wife for unpaid pre-petition loans and operating capital, a $5,000 worker's compensation claim, and unliquidated damage claims from the Founder related to his ouster and the Debtor's improper use of his IP.

### 6. The Post-Petition Budget and Interim Financing

#### a. A Budget with No Revenues and Only Operating Expenses

The Debtor's proposed post-petition budget, attached as Exhibit C to its original motion, evidences that the Debtor will be spending over $100,000 per month in professional fees in a reorganization that will not result in any revenue. Besides confirming that the Debtor will not have any revenues, the budget shows losses of $1.15 million in operating expenses, of which the highest amounts are for payroll ($540,000), consultants ($120,150), and a giant mystery entitled "other" ($260,000).

#### b. No Attempt To Solicit Alternative Financing

There is no evidence that the Debtor solicited alternative financing. Instead, the Debtor goes to great lengths to disguise its incestuous insider lending arrangement as arms-length and objective. To be clear, it is not.

The declarations of the Debtor's interim CEO, its board chair, and Insider DIP Financing representative state that the Debtor did not expect to find alternative financing. They do not admit that they tried.

Case: 20-30882   Doc# 88   Filed: 05/29/20   Entered: 05/29/20   14:15:33   Page 11 of
24

CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL

The Debtor's allegedly sterile "Special Committee" for financing and bankruptcy is comprised entirely of insider officers, not disinterested outside board members. This Special Committee in turn solicited only preferred shareholders for the Pre-Petition Insider Bridge Financing (the majority of whom are board members and were the Debtor's investment banker). Eighty percent of these same preferred shareholders now comprise the source for the Insider DIP Financing. There is no evidence that other shareholders were consulted.

While LVP claims to be disinterested in the financing, the RSA makes clear that it is not. It plays a key role as a controlling board member and preferred equity holder, and it will benefit handsomely from a reorganization that allows it to increase its equity position while wiping out the common shares, obtain repayment of any unsecured claims it has, and keep its board seats. Adding to the shenanigans, the Insider DIP Financing representative's declaration, was executed in Panama City, Panama—a money-laundering haven that is the subject of repeated investigation by the United States government and other international authorities.

### c. Impermissible Lending Terms

### i. Unseemly Interest Rates and Fees

The terms of the Insider DIP Financing are as problematic as they are suspicious. The DIP Term Sheet approved and authorized in paragraph 3 of the Interim Order charges interest at 10% per year, 5% for any escrowed funds, and 12% in default interest. (Amended Motion, Ex. D at page 98.) It also charges an exit fee of 10%, and an arranger fee of $45,000. (Amended Motion, Ex. D at pages 98, 100-101). In calculating borrowing amounts, the DIP Term Sheet excludes amounts for professional fees and carve-outs, even though the Debtor is authorized to use the Insider DIP Financing to pay such matters. This effectively removes any limit-guards on the Debtor's ability to wager through the restructuring. (Amended Motion, Ex. D at page 98.)

### ii. Insufficient Carve Out

The DIP Term Sheet and Interim Order also provide a carve out of $650,000 in the event of a Chapter 7 liquidation or for distribution under a confirmed plan. This amount is insufficient. To begin with, the Founder's pre-petition claims for financing the Debtor are over $1.5 million. (Sharma Decl. ¶¶2-3.) His Litigation claims to the IP, coupled with the damages attributable to his

ouster, are possibly even greater. Even if the Founder were to lose all his Litigation claims, $650,000 will leave nothing for unsecured claimants in a liquidation, given the amount of fees and interest charged under the DIP Term Sheet and the super-priority liens provided by the Interim Order. Moreover, the DIP Term Sheet contains a roll-up of the Pre-Petition Insider Bridge Financing and provides them adequate protection in the form of replacement liens, even though 80% of them are the same lenders as the Insider DIP Financing. (Amended Motion, Ex. D at page 101.) The Insider DIP Financing also pays all their fees and expenses. (*Id.*)

### iii. Overly Generous Collateral Pledge

The DIP Collateral (as defined in paragraph 10(a) of the Interim Order) includes all of the "property, assets or interests in property of the Debtor and the Debtor's estate." This is troubling because one of the Debtor's few real assets is D&O insurance. Given the number of insiders that are behind the bankruptcy case and its inbred lending arrangements, it can only be concluded that the Debtor has deliberately bargained away a key piece of collateral so as to put its insiders beyond reproach.

Although the Interim Order purports to preserve avoidance actions from the DIP Collateral, this is misleading. The Debtor's counsel's employment application indicates that it received nearly $300,000 during the preference period, and no explanation is provided to indicate that this payment is unavoidable. It is highly doubtful that the Debtor will seek to prosecute an avoidance action against its reorganization counsel. It is also highly doubtful that the Debtor will prosecute any insider claims against the people that are keeping it alive through bankruptcy, or the people that authorized this filing. Therefore, the Court should carefully scrutinize the DIP Term Sheet to verify that it is indeed practical or realistic.

### iv. Impermissible Involvement In Reorganization

In addition, the DIP Term Sheet contains a number of milestones that impermissibly involve the Insider DIP lenders in the Debtor's reorganization. The worst of these milestones is the RSA, in which the Debtor and its insider preferred shareholders/lenders are incestuously married, giving birth to a roll up of the Insider Pre-Petition Bridge Financing and a plan of reorganization that wipes out all common shareholders and leaves nothing for unsecured creditors in the event of a liquidation.

7

(Amended Motion, Ex. D at page 107.)  Indeed, paragraph 14(a) of the Interim Order declares that any chapter 11 plan that is not the Insider DIP Lenders plan or is inconsistent with the RSA constitutes an event of default of the Debtor's financing.  So is challenging the Insider DIP lender's right to credit bid or otherwise foreclose.  (Interim Order paragraph 14(f),(g)).

### v.    Lack of Financial Reporting

The DIP Term Sheet provides for financial reporting, but this information is not available to parties-in-interest or the Chapter 11 Trustee or US Trustee.  (Amended Motion, Ex. D at page 108.)

### vi.    Improper Collateral Waivers

In the event of a default, the DIP Term Sheet permits the Insider DIP lender to credit bid, without any further court oversight.  (Amended Motion, Ex D. at page 109.)  It also contains waivers of the 506(c) surcharge, broad indemnification of the Insider DIP lenders "and each of their respective directors, officers, employees, agents, shareholders, members and advisors," and waiver of the Section 552(b) equities of the case and marshalling exemption.   (Amended Motion, Ex. At page 112.)

Simply put, if the Debtor does not have the patience or the funds to proceed through the Litigation, the solution is not a bankruptcy by its preferred shareholders and insiders in which they take all of the Debtor's assets for themselves, wipe-out all common shareholders, and increase their ownership of the Debtor without searching for alternative financing.  Rather, as set forth below, the Debtor is a fiduciary and is supposed to consider all aspects as it enters the reorganization.  If it wants to use the reorganization process in the method that it has proposed, then its lender should be prepared to finance the outcome where the insiders driving the reorganization may be wrong by soliciting alternative financing, setting a much greater reserve for unsecured claims, truly pursuing avoidance actions, and preserving any D&O insurance proceeds strictly for unsecured creditors.  If they are unprepared to put their money where their mouth is, then the bankruptcy court will effectively have deprived the common shareholders and disputed claimants from having an opportunity to present their claims, as the proposed financing arrangement gives the preferred insiders everything right now.

Case: 20-30819   Doc# 193   Filed: 05/28/20   Entered: 05/28/20   13:45:33   Page 14 of 34

1 **III.    ARGUMENT**

2      Founder objects to the proposed Insider DIP Financing as it provides for overreaching

3  protections and benefits to the Insider DIP lenders and the Pre-Petition Insider Bridge Financing

4  lenders to the extreme prejudice of the Debtor's estate and unsecured creditors.  Founder sets forth

5  the following objections.

6      **A.    The Insider DIP Financing Cannot Meet the Standards for Approval**

7      A chapter 11 debtor may obtain post-petition financing on a super-priority basis only if, *inter*

8  *alia*, it cannot obtain "unsecured credit allowable under section 503(b)(1)" of the Bankruptcy Code.

9  *See* 11 U.S.C. § 364(c). In addition, a debtor may only obtain post-petition financing secured by

10 priming liens if, *inter alia*, it is "unable to obtain such credit otherwise." *See* 11 U.S.C. §

11 364(d)(1)(A); *In re Fleetwood Enterprises, Inc*., 427 B.R. 852, 858 (Bankr. C.D. Cal. 2010). While

12 approval of the proposed Insider DIP Financing is within the Court's discretion, the Court must

13 balance the interests of the Debtor, the Insider DIP lenders, and Pre-Petition Insider Bridge

14 Financing lenders (both of whom are essentially the same), and general unsecured creditors.

15      The court should approve a proposed debtor-in-possession facility only if such financing "is

16 in the best interest of creditors generally." *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr.

17 W.D.N.Y. 1985) (citing *In re Texlon Corp.*, 596 F.2d 1092, 1098-99 (2d Cir. 1979)). In addition, a

18 court must review the terms of a debtor-in-possession facility to determine whether those terms are

19 fair, reasonable, and adequate given the circumstances of the debtor and the proposed lender. *See,*

20 *e.g.*, *Aqua Assocs.*, 123 B.R. at 195-96 (holding that proposed financing should be beneficial and

21 reasonable); *Ames Dep't Stores*, 115 B.R. at 40 (courts should focus on whether the terms of

22 proposed DIP financing are reasonable); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr.

23 D.N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process

24 from one designed to accommodate all classes of creditors and equity interests to one specially

25 crafted for the benefit" of a single party); *see also In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60

26 (Bankr. N.D.N.Y 2005) (post-petition financing must be necessary to preserve the assets of the

27 estate).

28

**CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR
ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL**

Striking the appropriate balance requires that a debtor seeking post-petition financing on a super-priority basis and granting liens on previously unencumbered assets demonstrate that the proposed financing will permit it to formulate a successful plan for the benefit of the Debtor's estate and the interests of all its creditors. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."); *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991) (prohibiting benefiting a lender at the expense of the other unsecured creditors); *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtor cannot, solely for the sake of obtaining post-petition financing quickly and easily, abandon its fiduciary duties to its estate and creditors. *Ames Department Stores*, 115 B.R. at 38.

Likewise, section 364 of the Bankruptcy Code is not a "secured lenders' act" allowing a single creditor to upset the level playing field contemplated by the Bankruptcy Code. *See Ames Department Stores*, 115 B.R. at 37; *see also Defender Drug Store*, 145 B.R. at 317; *Tenney Village*, 104 B.R. at 568. The courts generally acknowledge that chapter 11 debtors have little bargaining power against a post-petition lender, especially when that lender also holds a pre-petition lien on the debtor's assets. *See In re Cooper Commons, LLC*, 430 F.3d 1215, 1219 (9th Cir. 2005); *Defender Drugs Stores.*, 145 B.R. at 317 ("[d]ebtors in possession regularly enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral."); *Ames Department Stores*, 115 B.R. at 38. Accordingly, courts reviewing proposed post-petition financing "focus[] their attention on proposed terms that would tilt the conduct of the bankruptcy case [or] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the right of all creditors[.]" *Id.* at 37.

Indeed, the Bankruptcy Court's decision in *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 56-62 (Bankr. N.D.N.Y. 2005), is instructive. In that case, the court evaluated whether a post-petition financing offer accepted by the Debtor's board met the standards for good business judgment. The court noted that corporate officers and directors have an obligation to perform their duties "in good

faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." In the bankruptcy context, the directors owe duties not only to the corporation and to its shareholders, they also owe a duty of good faith to the creditors. *Id.* at 58. The bankruptcy court then analyzed whether the Debtor's board sufficiently considered two financing officers, including whether the financing agreement was negotiated in good faith and at arm's length between the debtor and the lender and its agents.

In evaluating the debtor's board's business judgment, the business judgment rule governs unless: (1) the directors did not in fact make a decision, (2) the director's decision was uninformed, (3) the directors were not disinterested or independent, or (4) the directors were grossly negligent. *In re Los Angeles Dodgers, LLC*, 457 B.R. 308 (Bankr. D. Del. 2011) (failure of chapter 11 debtors and debtors-in-possession, which included LLC that owned major league baseball team and its affiliates, to attempt to obtain unsecured financing, and in fact refusing to engage in negotiations with league based on belief that league was hostile to them, precluded court's approval of proposed post-petition financings consisting of super-priority term loan facility).

Here, there is no evidence that the Debtor solicited or explored alternative financing, but rather conclusory-self-serving statements by its interim CEO, board chair, and DIP Lender representative that it did not expect to find alternative financing. Even its supposedly sterile "Special Committee" is comprised entirely of insider officers, not disinterested board members. These individuals then solicited only preferred shareholders, and gave them blanket liens on all the Debtor's assets as part of the Insider Pre-Petition Bridge Financing, taking away the Debtor's assets from its remaining stakeholders solely to finance this case. They then went one step further and conditioned that on the RSA and the Insider DIP Financing, which is also being provided by nearly all of the Debtor's preferred shareholders, *i.e.* the same people as who provided the Insider Pre-Petition Bridge Financing. Thus, the record is clear that the Debtor did not use its business judgment, but simply handed over everything to its preferred shareholders without consulting anyone or properly conducing its fiduciary duties. *See Geyer v. Ingersoll Publishing Co.*, 621 A.2d 784, 787 (Del. Ch. 1992) (directors owe fiduciary duty to corporation, but once it becomes insolvent, creditors replace stockholders as the primary beneficiaries).

11

Case: 20-30833   Doc# 201   Filed: 05/28/20   Entered: 05/28/20   16:55:33   Page 17 of
24

Moreover, the financing arrangement deliberately wipes out all the common shareholders through the RSA. Certainly, the Debtor's common shareholders should have been solicited before the Debtor's management or "Special" Committee made a unilateral decision to embark on a financing scheme that will eliminate their property. Indeed, Founder and other shareholders are prepared to lend the Debtor money, but obviously cannot do so with its current management in place, and where the funds would be used to destroy themselves. (Sharma Decl. ¶11.) Given that third parties and also common shareholders were not solicited, the Debtor has failed to show that less burdensome alternatives to the Insider DIP financing exists. *See, e.g., In re Los Angeles Dodgers, LLC*, 457 B.R. 308 (Bankr. D. Del. 2011) (failure of chapter 11 debtors and debtors-in-possession, which included LLC that owned major league baseball team and its affiliates, to attempt to obtain unsecured financing, and in fact refusing to engage in negotiations with league based on belief that league was hostile to them, precluded court's approval of proposed post-petition financings consisting of super-priority term loan facility).

Indeed, the bankruptcy court's ruling in *Tenney Village*, 104 B.R. at 568, has never been more applicable. As the court explained:

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways. The Financing Agreement would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt. It runs roughshod over numerous sections of the Bankruptcy Code. Under its rights of approval and supervision, the Bank would in effect operate the Debtor's business.

This is precisely what has transpired given the terms of the Insider DIP Financing, and its covenant with the RSA. The Final Order approving the Insider DIP Financing should thus be denied.

**B.    The Insider DIP Financing Is A *Sub-Rosa* Plan**

The Insider DIP Financing also constitutes an impermissible *sub rosa* plan, which is itself sufficient reason to deny the entry of a final order. A transaction is considered an impermissible *sub rosa* plan if it disposes of all or substantially all of the debtor's assets without following the Bankruptcy Code's procedural protections in connection with the development and approval of a

**CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL**

plan of reorganization, such that the sale itself is a *de facto* plan. A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization. *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (citations omitted); *Defender Drug Stores*, 145 B.R. at 317 ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."); *In re Chevy Devco*, 78 B.R. 585, 589-90 (Bankr. C.D. Cal. 1987).

Because of the importance of these protections in ensuring that creditors are treated fairly, courts have rejected proposed post-petition agreements between debtors and select creditors that have the effect of dictating material terms of a plan of reorganization without complying with the Bankruptcy Code's procedural requirements for plan confirmation. *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *In re Swallen's, Inc.*, 269 B.R. 634, 638 (6th Cir. BAP 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.").

It is also a fundamental policy of bankruptcy law that a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D. N.Y. 1994) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).

Here, one look at the DIP Term Sheet's milestones confirms that the Insider DIP Financing lenders and the Pre-Petition Insider Bridge Financing lenders are dictating this reorganization simply for themselves. The worst of these milestones is the RSA, in which all effectively the Debtor and its pre and post-petition lenders are incestuously married, giving birth to a roll up of the Insider Pre-Petition Bridge Financing and a plan of reorganization that wipes out all common shareholders, increases the insiders ownership, and leaves virtually nothing for unsecured creditors in the event of

13

Case: 20-30604 Doc# 259 Filed: 05/27/2020 Entered: 05/27/2020 14:15:33 Page 19 of 34

a liquidation. (Amended Motion, Ex. D at page 107.) Indeed, paragraph 14(a) of the Interim Order declares that any chapter 11 plan that is not the Insider DIP Lenders plan or is inconsistent with the RSA constitutes an event of default of the Debtor's financing. So is challenging the Insider DIP lender's right to credit bid or otherwise foreclose. (Interim Order paragraph 14(f),(g)). The Court should not sanction this, particularly in the context of a subchapter 5 reorganization, in which creditor's rights to challenge the DIP are streamlined and limited.

### C. The Insider DIP Financing Contains Impermissible Terms

The Insider DIP Financing contains multiple examples of impermissible terms.

#### 1. High Fees

The interest charges and fees are impermissible. The DIP Term Sheet, approved and authorized in paragraph 3 of the Interim Order, charges interest at 10% per year, 5% for any escrowed funds, and 12% in default interest. (Amended Motion, Ex. D at page 98.) It also charges an exit fee of 10%, and an arranger fee of $45,000. (Amended Motion, Ex. D at pages 98, 100-101.) In calculating borrowing amounts, the DIP Term Sheet excludes amounts for professional fees and carve-outs, even though the Debtor is authorized to use the Insider DIP Financing to pay such matters. This effectively removes any limit-guards on the Debtor's ability to wager through the restructuring. (Amended Motion, Ex. D at page 98.) The Court should not allow this.

#### 2. Insufficient Carve Out

The DIP Term Sheet and Interim Order's carve out of $650,000 in the event of a Chapter 7 liquidation or for distribution under a confirmed plan is insufficient. To begin with, the Founder's pre-petition claims for financing the Debtor are over $1.5 million. (Sharma Decl. ¶¶2-3.) His Litigation claims to the IP, coupled with the damages attributable to his ouster, are possibly even greater. In considering the proposed DIP Financing, the Court is obligated to consider the possible impact of the Debtor's ongoing civil litigation on the bankruptcy case and plan. *In re Harbin*, 486 F.3d 510, 517-518 (9th Cir. 2007). Under Harbin, the bankruptcy court must consider the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor. That has not happened here.

Even if the Founder were to lose on all of his Litigation claims, $650,000 will leave nothing for unsecured claimants in a liquidation, given the amount of fees and interest charged under the DIP Term Sheet and the super-priority liens provided by the Interim Order. Moreover, the DIP Term Sheet contains a roll-up of the Pre-Petition Insider Bridge Financing and provides them adequate protection in the form of replacement liens, even though 80% of them are the same lenders as the Insider DIP Financing. (Amended Motion, Ex. D at page 101.) The Insider DIP Financing also pays all their fees and expenses. (*Id.*)

### 3. Too Much Collateral and Improper Collateral Waivers

The DIP Collateral (as defined in paragraph 10(a) of the Interim Order) includes all of the "property, assets or interests in property of the Debtor and the Debtor's estate." This is troubling because one of the Debtor's few real assets is D&O insurance. Given the number of insiders that are behind the bankruptcy case and the lending arrangements, it appears that the Debtor has deliberately bargained away a key piece of collateral so as to put its insiders beyond reproach.

D&O asset recoveries should be carved out from the DIP Collateral, and avoidance actions should be pursued by an independent trustee or committee who is not beholden to the insiders in the same manner as the Debtor. The proceeds arising from any successful action against the directors and/or officers of the Debtor for breaching their fiduciary duties to the Debtor, the Debtor's estate and/or the Debtor's creditors, including but not limited to the proceeds of any director and officer liability insurance policy should be carved-out from the Collateral (as defined herein, the "D&O Action Proceeds"). The D&O Action Proceeds should be shared by the body of general unsecured creditors of the Debtor because they are the class of creditors that was harmed the most by the malfeasance of the Debtors' officers and directors. As such, it is entirely equitable for the Court to carve-out the D&O Action Proceeds from the Collateral.

Furthermore, in the event of a default, the DIP Term Sheet permits the Insider DIP lender to credit bid, without any further court oversight. (Amended Motion, Ex D. at page 109.) It also contains waivers of the 506(c) surcharge, broad indemnification of the Insider DIP lenders "and each of their respective directors, officers, employees, agents, shareholders, members and advisors," and

Case: 20-30819   Doc# 154   Filed: 05/28/20   Entered: 05/28/20   14:05:33   Page 21 of
34

waiver of the Section 552(b) equities of the case and marshalling exemption.  (Amended Motion, Ex. At page 112.)

The section 506(c) and 552 waivers serve no purpose, other than to eliminate a potential avenue of recovery for the Debtor's estate by ensuring that the costs of the Debtor's restructuring will be borne by the unsecured creditors alone--even if the unsecured creditors receive no value. Moreover, the waiver contravenes the intent behind Section 506(c) of the Bankruptcy Code. *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

The courts routinely reject attempted waivers of surcharge rights under Section 506(c). *In re The Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing with a section 506(c) waiver intact); *In re Willingham Invs., Inc.*, 203 B.R. 75, 80 (Bankr. M.D. Tenn. 1996); *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor…. The rule understandably shifts to the secured party … the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate....") (internal citation omitted); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (a secured party, and no other creditors, must bear the cost of preserving or disposing of its own collateral.); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").

Therefore, the Final DIP Order should not contain a waiver of the estate's rights under sections 506(c) and 552 of the Bankruptcy Code or the estate's rights under the marshalling doctrine.

Founder also objects to the roll up of the Bridge Notes, which were funded within days of the Petition Date.  By rolling up the pre-petition Bridge Notes into the Interim Financing, the Debtor is effectively encumbering all of its assets at an exponential level, tying everyone together in a mutual-

assured destruction RSA, and leaving nothing for unsecured creditors except for an insufficient carve-out designed to cloak their actions and bring Founder, any unsecured creditors which they do not pick, and the other common shareholders to their knees. *See In re Lehigh Valley Professional Sports Clubs, Inc.*, 260 B.R. 745, 751-752 (Bankr. E.D. Pa. 2001) (denying debtor ability to borrow money on a secured basis to pay selected creditors and elevate their status to the detriment of other creditors.)

### 4. Overly Broad Indemnity

Pursuant to the terms of the DIP Term Sheet, the Debtor is obligated to indemnify the DIP Lender Representative, the DIP Lenders and "each of their respective directors, officers, employees, agents, shareholders, affiliates, members and advisors" against any loss or liability with respect to the DIP Financing. (Amended Motion, Ex. D. at page 112.) Given that the DIP Lenders are comprised of effectively the same group of insiders, equity holders, and pre-petition lenders that engineered this bankruptcy, there should be no indemnification.

### 5. Unwarranted Adequate Protection

Founder objects to the various forms of "adequate protection" offered to the Bridge Noteholders, as set forth in paragraph 11 of the Interim Order. The Bridge Noteholders are obtaining senior replacement liens on all of the DIP Collateral, and having their debt rolled up with the DIP Lenders, thereby expanding their pre-petition lien position.

The purpose of adequate protection is to protect the value of a secured lender's bargained-for property interest in its pre-petition collateral. *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) (citations omitted). Adequate protection is intended to *preserve* a secured creditor's interest following the commencement of a bankruptcy case, not to *enhance* that creditor's position. *In re Mosello*, 195 B.R. 277, 289 (Bankr S.D.N.Y. 1996) (adequate protection must "protect[] . . . the secured creditor from diminution in value of its collateral during the reorganization process") (citations omitted); *see also In re Pine Lake Village. Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt.").

17

Case: 20-30805 Doc# 253 Filed: 05/28/20 Entered: 05/28/20 14:55:33 Page 23 of
34

1       Sections 361 through 364 of the Bankruptcy Code provide the framework for the granting of

2 post-petition adequate protection to pre-petition secured lenders. The Bankruptcy Code only

3 authorizes the granting of an additional or replacement lien as "adequate protection" to the extent

4 that such lien is needed to offset a decrease in the value of the secured creditor's interest in its

5 collateral; no such decrease in value has been shown here. Moreover, the pre-petition lenders and

6 post-petition lenders are effectively the same. Thus, the Court should deny the provisions granting

7 adequate protection.

8 **IV.    CONCLUSION**

9       For the reasons set forth herein, the Court should deny the Debtor's Amended Motion, not

10 enter a Final Order and grant all other relief that it deems just and proper.

11 DATED:  May 28, 2020          JAZ, A PROFESSIONAL LEGAL CORPORATION

12

13                         By:  /s/ Peter F. Jazayeri

14                            Peter F. Jazayeri

                    Attorneys for ADITYA SHARMA

15                     AND DR. ANSHU SHARMA

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF ADITYA SHARMA

I, Aditya Sharma, declare:

1.      I am over the age of 18 and qualified to provide this declaration, which I am submitting in response to Crosscode, Inc.'s (the "Debtor") Amended Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364(c), 364(d), and 507; (II) Authorizing Use of Cash Collateral; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief (the "Amended Motion.")

2.      In 2015, I founded the Debtor with my own personal funds, which is a software company.  I served as its Chief Executive Officer and Chairman of the Board until November 2019, at which time I was informed that I was removed by the Debtor's new board of directors, which were constituted by an investment banking group, Liquid Venture Partners ("LVP") hired to raise a preferred capital offering for the Debtor.  The circumstances of my ouster are currently the subject of contested litigation, pending before the Hon. Vince Chhabria in the Northern District of California, as Case No. 3:20-CV-00104-VC, based on a complaint brought by the Debtor, and a now-stayed cross-complaint filed by me (the "District Court Litigation").  I believe I have valuable claims against the Debtor, ranging from unpaid loans, to claims on its intellectual property and torts related to my improper ouster.

3.      From 2016 through 2019, until the Debtor was able to secure an investment from LVP, the Debtor lacked sufficient operating capital.  I, along with my wife, loaned the Debtor over $920,000 in personal funds to keep the Debtor operating (the "Capital Infusions").   A true and correct copy of a June 2019 report prepared by the Debtor's certified public accountant and also recorded in the Debtor's financial systems, evidencing the Capital Infusions is attached hereto as Exhibit "A" and incorporated herein by this reference.

4.      Without the Capital Infusions, the Debtor would not have survived.

5.      I have reviewed the emergency first-day motions filed by the Debtor, along with the Amended Motion.  I note that these motions do not properly identify me or my wife as a creditor, or otherwise acknowledge the Capital Infusions or amounts owing to me.

6.     I am the single largest shareholder of the Debtor, comprising nearly 60 percent of the common shares.  There are approximately 4,000,137 outstanding common shares, 3,850,000 series A preferred shares, and 370,000 warrants on the series A preferred shares.  As such, the Debtor's equity is broken almost equally between the common and preferred shares, slightly in favor of the common.  The preferred shares are held almost entirely by principals of LVP.

7.     I did not receive formal notice of this bankruptcy until May 11, 2020, at which time I received a notice in the mail regarding appointment of a trustee.  The Debtor apparently sent an email to some of its shareholders on the petition date informing them of the bankruptcy, but it did not include me in any of these communications.  Despite being the largest shareholder, I was never consulted regarding this bankruptcy case or asked to provide additional financing.  I can and would be willing to provide additional financing to the Debtor, provided that it can be done in a manner that is fair and reasonable to all of the Debtor's stakeholders.

8.     I have reviewed the Debtor's Motion for Entry of An Order Authorizing the Debtor's Assumption of the Restructuring Support Agreement ("RSA Motion").  I have also reviewed the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing Pursuant to 11 U.S.C. sections 105, 362, 363, 364(c), 364(d) and 507; (II) Authorizing Use of Cash Collateral; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion").

9.     The Cash Collateral Motion, in its amended Exhibit C, contains a budget that projects over $411,500 in professional and administrative expenses over the next twelve weeks.  Meanwhile, this same budget projects no receipts by the Debtor during this time period.  This budget suggests that the money to be lent to the Debtor as part of this reorganization is simply to finance professional fees, not the genuine business operations of a software company.

10.     At the same time, the RSA Motion seeks to wipe out the Debtor's common stock, and grant secured liens and interests to the series A preferred insiders, who appear to have put together a financing plan through their affiliates or associates.  Given the arguments and information set forth in the RSA Motion and the Cash Collateral Motion, and the Amended Motion, it does not appear that this bankruptcy is a bona-fide reorganization, but rather, an attempt by several insiders, in

20

connection with a cadre of professionals, to circumvent the District Court Litigation, ambush me, wipe the Debtor of its common shareholders, and increase their ownership stake.

11.    I am prepared to provide alternative financing to the Debtor.  However, I cannot do so unless there are adequate safeguards in place to protect me from the Debtor's continued mismanagement.  I have also spoken with other shareholders who are interested in a change.

I certify and declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of May 2020, at Maple Grove, Minnesota.

_____

ADITYA SHARMA

5/27/2020

**CREDITOR ADITYA SHARMA'S OBJECTION TO DEBTOR'S AMENDED MOTION FOR ENTRY OF FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING ET AL.**

# EXHIBIT A

**Current Portion of LTD Related Party**

  **Due to Shareholder**

| Date | Transaction Type | Num | Adj | Name | Memo/Description |
|---|---|---|---|---|---|
| 06/30/2016 | Journal Entry | June16 Exp | No | | Freelance Consulting Fees - Mock Up |
| 06/30/2016 | Journal Entry | June16 Exp | No | | Advisco Capital Fees Reimb |
| 06/30/2016 | Journal Entry | June16 Exp | No | | Brokerage Fees Reimb |
| 01/10/2017 | Journal Entry | G/L Adj | No | | Credit Line Pmt By Adi - to be reimb |
| 01/01/2018 | Journal Entry | Uncleared PR Tax | No | | Reclass Uncleared Balance MN Rev W/H |
| 09/30/2018 | Journal Entry | Due To Shareholderr | No | | Reclass to due to Shareholder stock sub rec'ble |
| 09/30/2018 | Journal Entry | Due To Shareholderr | No | | Reclass to due to Shareholder mn ui lost payment |
| 11/30/2018 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 12/14/2018 | Journal Entry | Tsfr Personal Exp | No | | Amex Dec Pd By Adi Personally |
| 12/30/2018 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 01/04/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 01/04/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 01/07/2019 | Journal Entry | SOFI | No | | Pd By Adi |
| 01/15/2019 | Journal Entry | NP Related | No | | Pd By Adi |
| 01/15/2019 | Journal Entry | NP Related | No | | Pd By Adi |
| 01/22/2019 | Journal Entry | WF | No | | Pd By Adi |
| 01/28/2019 | Journal Entry | Upgrade | No | | Pd By Adi |
| 01/30/2019 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 02/04/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 02/06/2019 | Journal Entry | Wells Fargo | Yes | | Wells Fargo Pd By Adi |
| 02/07/2019 | Journal Entry | SOFI | No | | Pd By Adi |
| 02/07/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | ADITYA SHARMA-02001 |
| 02/11/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | Amex Pd By Adi |
| 02/15/2019 | Journal Entry | NP Related | No | | Pd By Adi |
| 02/20/2019 | Journal Entry | Pd By Adi | No | | Kabbage Pd By Adi |
| 02/20/2019 | Journal Entry | WF | No | | Pd By Adi |
| 02/22/2019 | Journal Entry | Note P'ble PD By Adi | No | | Note P'ble PD By Adi |

| | | | | | |
|---|---|---|---|---|---|
| 02/22/2019 | Journal Entry | Note P'ble Pd By Adi | No | | Note P'ble Pd By Adi |
| 02/26/2019 | Journal Entry | Upgrade | No | | Pd By Adi |
| 02/28/2019 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 02/28/2019 | Journal Entry | Brunson Legal | No | | Pd By Adi Brunson Chandler & Jones |
| 02/28/2019 | Journal Entry | Adj for stopped pmt | No | | reversed principal credit on payoff for stopped pmt |
| 03/04/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 03/06/2019 | Journal Entry | Wells Fargo | Yes | | Wells Fargo Pd By Adi |
| 03/07/2019 | Journal Entry | SOFI | No | | Pd By Adi |
| 03/07/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | ADITYA SHARMA-02001 |
| 03/11/2019 | Journal Entry | Lightstream | No | | Pd By Adi |
| 03/14/2019 | Journal Entry | Pd By Adi | No | | Kabbage Pd By Adi |
| 03/14/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | Amex Pd By Adi |
| 03/15/2019 | Journal Entry | NP Related | No | | Pd By Adi |
| 03/20/2019 | Journal Entry | WF | No | | Pd By Adi |
| 03/26/2019 | Journal Entry | Upgrade | No | | Pd By Adi |
| 03/31/2019 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 04/04/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 04/07/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | ADITYA SHARMA-02001 |
| 04/08/2019 | Journal Entry | Wells Fargo | No | | Wells Fargo Pd By Adi |
| 04/08/2019 | Journal Entry | SOFI | No | | Pd By Adi |
| 04/11/2019 | Journal Entry | Lightstream | No | | Pd By Adi |
| 04/13/2019 | Credit Card Credit | Amex | No | AMERICAN Express | Amex Pd By Adi |
| 04/15/2019 | Journal Entry | A/P Pd By Adi | No | | Pd By Adi - Delaware Division of Corporations |
| 04/15/2019 | Journal Entry | NP Related | No | | Pd By Adi |
| 04/15/2019 | Journal Entry | Pd By Adi | No | | Kabbage Pd By Adi |
| 04/22/2019 | Journal Entry | WF | No | | Pd By Adi |
| 04/26/2019 | Journal Entry | Upgrade | No | | Pd By Adi |
| 04/30/2019 | Journal Entry | Pd By Adi | No | | Kabbage Pd By Adi |
| 04/30/2019 | Journal Entry | Prosper | No | | Pd by Adi personally |
| 05/06/2019 | Journal Entry | Lending Club | No | | Pd by Adi personally |
| 05/07/2019 | Credit Card Credit | Pd By Adi | No | AMERICAN Express | ADITYA SHARMA-02001 |
| 05/07/2019 | Journal Entry | SOFI | No | | Pd By Adi |
| 05/20/2019 | Journal Entry | Reclass to Payoff | No | | Tsfr N/P Related Party for payoff / reclass to stock |
| 05/20/2019 | Journal Entry | Reclass for payoff | No | | Reclass Related Party #2-10 for payoff / reclass to stock |
| 06/10/2019 | Journal Entry | Accrued Int | No | | Accrued Interest Due To Shareholder 6/10/19 |

| | | | | |
|---|---|---|---|---|
| 06/10/2019 | Journal Entry | Accrued Int | No | Accrued Interest Notes Payable #2-10 Related Party 6/10/19 |
| 06/10/2019 | Journal Entry | Accrued Int | No | Accrued Interest Note Payable #1 Related Party 6/10/19 |

**Total for Due to Shareholder**

**Total for Current Portion of LTD Related Party**

**TOTAL**

Monday, Jun 10, 2019 11:10:13 AM GMT-7 - Accrual Basis

| Account | Split | Amount | Balance |
|---|---|---|---|
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,500.00 | 2,500.00 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 20,000.00 | 22,500.00 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 10,000.00 | 32,500.00 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,744.31 | 35,244.31 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 266.44 | 35,510.75 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | -200.00 | 35,310.75 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | -3,684.80 | 31,625.95 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 32,245.12 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 274.00 | 32,519.12 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 33,138.29 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 33,936.78 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 34,735.27 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,066.55 | 35,801.82 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,290.00 | 41,091.82 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,289.90 | 46,381.72 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,062.55 | 48,444.27 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,029.69 | 49,473.96 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 50,093.13 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 50,891.62 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,237.85 | 52,129.47 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,066.55 | 53,196.02 |
| Current Portion of LTD Related Party:Due to Shareholder | AMEX xxxx1003 | 16,569.34 | 69,765.36 |
| Current Portion of LTD Related Party:Due to Shareholder | Amex 3798****1003 | 277.00 | 70,042.36 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,289.90 | 75,332.26 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 3,672.50 | 79,004.76 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,062.55 | 81,067.31 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 6,335.61 | 87,402.92 |

| | | | |
|---|---|---|---|
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 176,413.05 | 263,815.97 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,029.69 | 264,845.66 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 265,464.83 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,250.00 | 270,714.83 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | -6,335.61 | 264,379.22 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 265,177.71 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,118.06 | 266,295.77 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,066.55 | 267,362.32 |
| Current Portion of LTD Related Party:Due to Shareholder | AMEX xxxx1003 | 13,682.85 | 281,045.17 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,099.70 | 283,144.87 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 3,772.50 | 286,917.37 |
| Current Portion of LTD Related Party:Due to Shareholder | Amex 3798****1003 | 255.00 | 287,172.37 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,289.90 | 292,462.27 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,062.55 | 294,524.82 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,029.69 | 295,554.51 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 296,173.68 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 296,972.17 |
| Current Portion of LTD Related Party:Due to Shareholder | AMEX xxxx1003 | 21,544.55 | 318,516.72 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,237.84 | 319,754.56 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,066.55 | 320,821.11 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,099.70 | 322,920.81 |
| Current Portion of LTD Related Party:Due to Shareholder | Amex 3798****1003 | 309.00 | 323,229.81 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,080.00 | 324,309.81 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 5,289.90 | 329,599.71 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,886.25 | 331,485.96 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 2,062.55 | 333,548.51 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,029.69 | 334,578.20 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 943.13 | 335,521.33 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 619.17 | 336,140.50 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 798.49 | 336,938.99 |
| Current Portion of LTD Related Party:Due to Shareholder | AMEX xxxx1003 | 4,853.85 | 341,792.84 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,066.55 | 342,859.39 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 199,993.39 | 542,852.78 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 360,000.00 | 902,852.78 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 4,678.96 | 907,531.74 |

| | | | |
|---|---|---|---|
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 12,567.12 | 920,098.86 |
| Current Portion of LTD Related Party:Due to Shareholder | -Split- | 1,457.97 | 921,556.83 |
| | | **$ 921,556.83** | |
| | | **$ 921,556.83** | |
| | | **$ 921,556.83** | |