1   Michael S. Kogan (SBN 128500)
2   **KOGAN LAW FIRM, APC**
    1849 Sawtelle Blvd., Suite 700
3   Los Angeles, California 90025
    Telephone 310.954.1690
    mkogan@koganlawfirm.com
4

5

  Attorneys for Masoud Toghraie
6

7

8

9             **UNITED STATES BANKRUPTCY COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11              **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 12   **In re** | )   **Case No. 3:20-bk-30383 (DM)** |
| 13   **CROSSCODE, INC.,** | ) <br> )   **Chapter 11** |
| 14         **Debtor.** | )   **OBJECTION TO CONFIRMATION OF** |
| 15 | )   **AMENDED CHAPTER 11 (SUBCHAPTER** <br> )   **V) PLAN OF REORGANIZATION DATED** <br> )   **AUGUST 31, 2020** |
| 16 | ) |
| 17 | ) |
| 18 | )   **Date:**     **September 23, 2020** <br> )   **Time:**     **9:30 a.m.** |
| 19 | )   **Place:**     **United States Bankruptcy Court** <br> )              **Courtroom 17, 16th Floor** |
| 20 | ) |
| 21 | ) |
| 22 | ) |

23       Masoud Toghraie ("**Equity Holder**") a holder of 196,000 shares of post-split common

24   shares in Crosscode, Inc.[1], hereby files its objection to confirmation of Crosscode, Inc.'s (the

25

26

27           _____

28   [1] Prior to split of common shares, Equity Holder held 3,000,000 shares of common stock.

"**Debtor**") Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated August 31, 2020 (the "**Amended Plan**"), and respectfully states as follows:

## I.

### PROCEDURAL BACKGROUND OF AMENDED PLAN

On August 3, 2020, Debtor filed its original Chapter 11 (Subchapter V) Plan of Reorganization Dated August 3, 2020 (Doc. # 110) (the "**Original Plan**"). The Order Setting Confirmation Hearing and Related Deadlines (Doc. # 113) set the hearing on the Original Plan for September 3, 2020, and on or before August 7, 2020, the Debtor shall serve a copy of the order, a copy of the [Original] Plan, a form of ballot, and a copy of a notice of hearing to consider confirmation on the case on various parties. The Court's order further required that on or before August 25, 2020, all parties entitled to vote shall vote on the Original Plan and file any objections to the Original Plan. On August 29, 2020, Equity Holder filed his Objection to Confirmation of Chapter 11 (Subchapter V) Plan of Reorganization Dated August 3, 2020 (the "**Original Objection**"). On August 31, 2020, the Debtor filed its Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated August 31, 2020 (Doc # 136) (the "**Amended Plan**")[2]. The Court at the hearing on September 3, 2020 continued the hearing to September 23, 2020. The Debtor has filed its Supplemental Brief in Support of Debtor's Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated August 31, 2020 (Doc. # 150) ("**Supplemental Brief**"), Supplemental Declaration of Rahul Gandhi in Support of Confirmation of Debtor's Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated August 31, 2020 along with 1,314 pages of Exhibits (Doc. # 151) ("**Supplemental Declaration Gandhi**"). Further the Debtor has filed Second Declaration of Rahul Gandhi in Support of Confirmation of Debtor's Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated August 31, 2020 (Doc. # 153) ("**Second**

---

[2] The Debtor also filed a Redline of the Original Plan to the Amended Plan (Doc # 139) on

**Supplemental Declaration Gandhi"). The Debtor has not filed a motion to modify the Original Plan,** although parties relied upon the Original Plan for voting and analysis of approval and opposition to the Debtor's plan of reorganization as all of those events occurred prior to the filing of the Amended Plan. All voting occurred prior to the filing of the Amended Plan, and no notice was sent by the Debtor to creditors and interested parties of the 110 changes that occurred to the Original Plan[3], that parties entitled to vote could change their votes or for that matter anything else relevant to the Amended Plan. Essentially creditors and parties in interest have never received any information relevant to the Amended Plan to make an informed judgment as to whether to support it or not.

## II.

## BACKGROUND[4]

The Debtor requests that this Court approve the Amended Plan that fails to provide the prerequisites required under 11 U.S.C. §§ 1129, 1191 and other provisions of the Bankruptcy Code, and thus the Amended Plan is patently unconfirmable[5]. Relevant statutory authority and case law mandate that this Court deny approval of the Amended Plan. **The Amended Plan is a clear attempt to accomplish one goal – take away Equity Holder's interest in the Debtor while allowing other similar class members of Equity Interests to retain their Equity Interests. This is impermissible.**

---

September 1, 2020 (**"Notice of Amended Plan"**).

[3] See Notice of Amended Plan page 59.

[4] The Equity Holder previously submitted the Declaration of Masoud Toghraie to support these facts and thus requests that the Court take judicial notice of that Declaration as if it was filed herein to support this Objection.

[5] Unless defined otherwise herein, the capitalized, defined terms herein shall have the same definitions ascribed to them in the Amended Plan.

As set forth previously, Equity Holder was an investor in the Debtor in its early stages of development and ultimately is the holder of 196,000 shares of common stock in the Debtor. The Debtor is a non-revenue startup software company that was created in 2015 by Aditya Sharma, who is also a common shareholder (**"Founder"**). **Founder who was the largest common share holder, settled with the Debtor and has or will receive $250,000 on his claims against the Debtor (which looking at substance over form includes his common stock interests).** Founder served as its Chief Executive Officer and Chairman of the Board until November 2019. Founder helped Debtor raise $9,300,000 through an investment banking group, Liquid Venture Partners (**"LVP"**), in a series A preferred capital fundraising. Shortly after the financing was obtained, LVP reconstructed the Debtor's board, fired Founder and ousted him from his board membership.

The circumstances of Founder's ouster, along with his claims to ownership of additional company stock, ownership and licensing claims for the Debtor's intellectual property, and repayment of unpaid loans, are the subject of contested litigation, pending before the Hon. Vince Chhabria in the Northern District of California, as Case No. 3:20-CV-00104-VC, based on a complaint brought by the Debtor, and a now-stayed cross-complaint filed by Founder (the **"District Court Litigation"**), which may have been one of the primary factors for the bankruptcy filing.

Prior to the bankruptcy filing there were approximately 4,000,137 outstanding common shares, 3,850,000 series A preferred shares, and 370,000 warrants on the series A preferred shares, which comprise the entire Equity Interests **as defined in the Amended Plan section 9.46**. As such, the Debtor's equity is broken almost equally between the common and preferred shares, slightly in favor of the common. The preferred shares are held almost entirely by principals of LVP.

From the Equity Holders perspective, this bankruptcy case is very much a two-party dispute between the LVP-led owners of the Debtor's preferred shares and other Equity Interests. It is undisputed that immediately before the Debtor filed its petition, a special committee consisting of the Debtor's interim CEO and the Debtor's first employee solicited the Debtor's preferred shareholders for a plan to secure all of the Debtor's assets and use the bankruptcy process to flush away part of the Equity Interests consisting of the common shareholders.

Approximately two weeks before the Debtor filed its petition, the Debtor obtained secured insider financing from six of its preferred shareholders, including the Debtor's current CFO, and five board members (the "**Pre-Petition Insider Bridge Financing**"). The Pre-Petition Insider Bridge Financing was conditioned on a restructuring support agreement ("**RSA**") and a subscription for post-petition financing, which was also being funded by a group comprising 80% of the insider preferred shareholders (the "**Insider DIP Financing**"). Together, the Pre-Petition Insider Bridge Financing would be rolled up with the DIP lending during the reorganization process. The selected preferred shareholders/insider lenders and the Debtor would be married through the RSA. Prior to this arrangement, the Debtor did not have any secured debt.

By doing this, the Debtor has effectively gamed the new small business bankruptcy rules and used them to accomplish its primary goal of washing away part of its Equity Interests, namely the common shareholders.

The Debtor post-petition has used DIP financing to improve the position of the Pre-Petition Insider Bridge financiers. It has assured through the financing and ultimately the Amended Plan, that the Debtor and its preferred shareholders, eliminate the Equity Interests of the common shareholders, and increase their ownership stake, leave the Debtor without any revenues or runway by confirmation time, while promoting the idea that they can raise exit financing for a bankrupt, non-revenue company in the midst of a global pandemic. Simply put, the Debtor's

Amended Plan is nothing more than a ruse to allow its preferred Equity Interests/financiers

further means to seize the Debtor's assets, increase their ownership, and wipe out the common

shareholders.

## II.

## LEGAL ARGUMENT

New 11 U.S.C. § 1191, which governs confirmation of Subchapter V plans, and provides in relevant part:

**(a) TERMS.—**
The court shall confirm a plan under this subchapter only if all of the requirements of section 1129(a), other than paragraph (15) of that section, of this title are met.

**(b) EXCEPTION.—**
Notwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs **if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted**, the plan.

**(c) RULE OF CONSTRUCTION.—**For purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:
    **(1)** With respect to a class of secured claims, the plan meets the requirements of section 1129(b)(2)(A) of this title.
    **(2)** As of the effective date of the plan—
    **(A)** the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or
    **(B)** the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

    **(3)**
    **(A)**
    **(i)** The debtor will be able to make all payments under the plan; or
    **(ii)** there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

**(B)** the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.
(emphasis added)

Thus, we look to this provision and section 1129 for the Court to make its determination and findings to determine if the Amended Plan meets the requirements for confirmation.

The standards governing confirmation of a plan of reorganization are set forth in Section 1129 and 1191 of the Bankruptcy Code. The proponent of a Chapter 11 plan bears the burden of proving that the plan satisfies each of the statutory requirements set forth in Section 1129. See In re Kemp, 134 B.R. 413 (Bankr. E.D. Cal. 1991); In re Revco D.S., Inc., 131 B.R. 615, 620 (Bankr. N.D. Ohio 1990); and In re Rusty Jones, Inc., 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990).

### A. The Amended Plan Fails to Properly Comply with Section 1127(a) of the Bankruptcy Code.

The Debtor is proposing the modified Amended Plan without requesting Court approval of the modifications through a **motion to modify the Original Plan**, although parties relied upon the Original Plan for voting and analysis of approval and opposition to the Debtor's plan of reorganization as all of those events occurred prior to the filing of the Amended Plan. All voting occurred prior to the filing of the Amended Plan, and no notice was sent by the Debtor to creditors and interested parties of the 110 changes that occurred to the Original Plan[6], that parties entitled to vote could change their votes or for that matter anything else relevant to the Amended Plan. Essentially creditors and parties in interest have never received any information relevant to the Amended Plan to make an informed judgment as to whether to support it or not. The modifications which are material changes to the Original Plan have never been described to creditors and other interested parties, or even the basis for such changes.

The material changes include but are not limited to:

---

[6] See Notice of Amended Plan page 59.

| | |
|---|---|
| 1 | • "other than the Plan Fund" being vested in the Reorganized Debtor, and other material |
| 2 | items effecting the Plan Fund. |
| 3 | • The DIP Facility principal amount was changed to $1,902,221. |
| 4 | • Material changes to the disclosure regarding the offering and issuance of securities. |
| 5 | • Tax effects on Equity Interests. |
| 6 | • Changes to the Plan Injunction provisions. |
| 7 | • Title to Assets on the Effective Date. |
| 8 | • Updated Budget – Exhibit "B". |

<u>Significantly</u>, after the filing of the Amended Plan on August 31, 2020, the Debtor has filed its Plan Fund and Cash forecast (See Supplemental Declaration of Gandhi, Exhibit "C"), a three year projection of revenues, expenses and operating profit for 2021-2023 (See Supplemental Declaration of Gandhi, Exhibit "D"), estimate of value distributed under Amended Plan (See Supplemental Declaration of Gandhi, Exhibit "E"), capitalization table (See Supplemental Declaration of Gandhi, Exhibit "F"), commitment letters and Purchase Agreement (See Second Supplemental Declaration of Gandhi, Exhibits "A" and "B"). **All of these documents are material to creditors making decisions on the Amended Plan and should have been provided before anyone had to make a decision on the Amended Plan.**

11 U.S.C. § 1127 provides in relevant part as follows:

(a)     The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

…

(c)     The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d)     Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. §§ 1127(a), (c) & (d).

Rule 3019 of the Federal Rules of Bankruptcy Procedure provides as follows:

> (a)     <u>Modification of a Plan Before Confirmation</u>. In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. **If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely affect the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.**

Fed. R. Bankr. P. 3019 (emphasis added).

Section 1129(a)(1) requires that the plan comply with the "applicable provisions of this title," and § 1129(a)(2) requires a plan proponent similarly comply. Whereas § 1129(a)(1) focuses on the form and content of the actual plan, § 1129(a)(2) focuses on a plan proponent's activities. Adequacy of disclosure is an essential element for plan confirmation by way of § 1129(a)(2). See, e.g., <u>In re Sierra-Cal</u>, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997). When the Amended Plan was served on creditors, the accompanying notice did not indicate that creditors would have the right to change their ballots, what the changes were to the Original Plan, or even file objections to the Amended Plan.

Section 1127(a) allows a plan proponent to modify a plan at any time before confirmation so long as the modified plan meets the requirements of §§ 1122 and 1123. Section 1127(c) requires the proponent of the modification to comply with § 1125 "with respect to the plan as modified." Plan modifications do not require a new disclosure statement and court approval unless **the modifications are material**. <u>Andrew v. Coopersmith (In re Downtown Inv. Club III)</u>, 89 B.R. 59, 65 (9th Cir. BAP 1988).

The word "material" in this context has been described as "so affect[ing] a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." <u>In re Am. Solar King Corp.</u>, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (quoting 8 Collier on Bankruptcy, ¶ 3019.03 at 3019-3 (15th ed. 1987)). <u>Enron Corp. v. New Power Co. (In re New Power Co.)</u>, 438 F.3d 1113, (11th Cir. 2006), explained:

The Bankruptcy Code requires that every holder of a claim or interest receive a court-approved written disclosure statement containing "adequate information" about a proposed plan before its vote on that plan may be solicited. 11 U.S.C. § 1126(b)(2). Even after the vote, a plan proponent may modify a plan before confirmation as long as the plan still satisfies all requirements concerning plan contents and the classification of claims and interests. 11 U.S.C. §§ 1127, 1122, 1123. **After notice and a hearing**, the bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated. Id. § 1127(d); Fed.R.Bankr.P. 3019; see also In re Am. Solar King Corp., 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988). If it does, the claim or interest holder is entitled to a new disclosure statement and another vote. Solar King, 90 B.R. at 823.
Id. at 1117-18.

The Debtor has not complied with the "after notice and a hearing" requirement, and as the changes are material, solicitation of votes should occur again. Whether a debtor needs to re-solicit votes on modifications to a plan of reorganization depends on whether the modification is material or not and whether the creditors and interest holders are adversely affected. In re Boroff 189 B.R. 3, 57 (D. Vt. 1995) (quoting In re Frontier Airlines, Inc., 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) ("If the modification adversely affects the interests of a creditor in more than a purely ministerial, de minimus manner, that creditor should have the opportunity to reconsider and change his or her vote."). Here the modification and Exhibits recently provided by Gandhi adversely affect the interests of creditors in more than a purely ministerial, de minimus manner, and creditors should have the opportunity to reconsider and change his or her vote.

Here, the Debtor has proposed modifications and information which materially adversely affect creditors and interest holders. **The modifications of the Amended Plan have affected the economic value of the recovery apportioned to creditors and interest holders and can only be approved on a noticed motion after hearing in which all parties are apprised of the modifications and their effect.**

### B. The Injunctions and Released Claims Violate the Bankruptcy Code.

The Amended Plan contains releases of claims held by non-debtor third-parties against other non-debtors, which would require affirmative (or opt-in) consent, and thus are impermissible

under the Bankruptcy Code and applicable case law, including recent decisions by the Ninth

Circuit in <u>Blixseth v. Credit Suisse (In re Blixseth)</u>, 961 F.3d 1074 (9th Cir. 2020) and by this

Court in <u>In re PG&E Corp.</u>, Case No. 19-30088-DM, 2020 Bankr. LEXIS 1586 (Bankr. N.D. Cal.

June 17, 2020). The Plan contains impermissible (a) releases of rights and causes of action held by

the Debtor (Plan Section 5.5); (b) injunctions with respect to the assertion or enforcement of (i)

Claims or Equity Interests that were held against or in the Debtor or (ii) direct or derivative Claims

released pursuant to the Plan (Plan Section 5.6); and to which the Debtor provided only voting  and

non-voting parties-in-interest an opportunity to opt-out of rather than opy-in as this Court has

previously ruled in the <u>PG&E</u> case.

The Amended Plan provides at section 9.65 that "Released Parties" are

> **Individually and collectively, the Debtor's Representatives, the
> Subchapter V Trustee (solely in his capacity as such), the DIP Lenders, the
> DIP Lender Representative, Aditya Sharma, Anshu Sharma, and the
> Representatives of each of the foregoing (solely in their capacities as such).**

(emphasis added)

The Amended Plan provides for injunctions against non-debtor parties from bring actions

against non-debtor parties at section 5.6 as follows:

> On the Effective Date, all Persons who have been, are, or may be holders of
> Claims against or Equity Interests in the Debtor shall be permanently enjoined
> from taking any of the following actions against or affecting Reorganized
> Crosscode, the Debtor, the estate, their property**, any disbursing agent under
> the Plan, the Plan Fund, or any of their respective current or former
> members, directors, managers, officers, employees, agents, trustees,
> professionals or successors and assigns or their respective assets and property**
> with respect to such Claims or Equity Interests.
> **(emphasis added)**

As demonstrated herein, the Amended Plan violates some of the most basic tenets of

confirmation regarding third party injunctions, thereby rendering the Amended Plan

unconfirmable.

The Amended Plan also provides at Section 5.5 of the Amended Plan releases by the Debtor of claims it, and its estate, holds against certain Released Parties (as defined in Plan Section 9.65 above).

Because the enforcement injunction permanently enjoins creditors from pursuing their claims and provides a discharge to non-debtor parties, this is patently impermissible under Section 524(e) of the Code. Section 524(e) of the Code provides as follows: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Ninth Circuit has repeatedly reversed the granting of a permanent injunction against suing non-debtors on the basis that the case prohibited permanent relief that had the effect of releasing the non-debtor party from liability. *See* American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.), 885 F.2d 621 (9th Cir. 1989); *see also* Resorts Int'l v. Lowenschuss (In re Fred Lowenschuss), 67 F.3d 1394 (9th Cir. 1995) (citing Rohnert Park, *infra*).

In American Hardwoods, the Ninth Circuit addressed whether the bankruptcy court has the jurisdiction and power to permanently enjoin a creditor from enforcing a state court judgment against non-debtor guarantors. The Ninth Circuit first considered whether it had jurisdiction over the debtor's adversary proceeding to temporarily and permanently enjoin the creditor from pursuing its action in the state court against the guarantors and enforcing its judgment against such guarantors. Id. at 623-24. The Ninth Circuit found that the bankruptcy court had "related to" jurisdiction under 28 U.S.C. §§ 157, 1334, citing In re Fietz, 852 F. 2d 445 (9th Cir. 1988). Id. In that case, the Ninth Circuit adopted the approach of the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) with respect to related to jurisdiction. Pacor defined the test for determining whether a civil proceeding was related to a bankruptcy case as "whether the outcome of the proceeding could conceivably have any effect on the estate being administered in

bankruptcy." Under this definition, the Ninth Circuit concluded that the bankruptcy court had related to jurisdiction over the action to enjoin the creditor from enforcing its state court judgment against the principals of the Debtor. Id. at 623. The Ninth Circuit then considered whether the bankruptcy court had the power to issue a permanent injunction enjoining enforcement of a state court judgment. Id. at 624-26. The Court concluded that the bankruptcy court did not have such power as the injunction would have the effect of a discharge of third party liability which is prohibited by Section 524(e) of the Bankruptcy Code. Id. at 627.

Further, the Ninth Circuit has interpreted Section 524(e) as precluding "bankruptcy courts from discharging the liabilities of non-debtors." Resorts Int'l v. Loweschuss (In re Lowenschuss), 67 F.3d 1394, 1401 (9th Cir. 1995). In Lowenschuss, the bankruptcy court confirmed a plan which essentially granted blanket immunity to the debtor's pension plan, the debtor's professional corporation and the debtor's children by granting permanent releases of all claims and releasing all liens, levies and attachments held by anyone against those third parties. Id. The Ninth Circuit determined that the plan's broad, permanent releases of third parties violated Section 524(e). Id. at 1402.

The Debtor in the Amended Plan has to complied with the teachings of PG&E in which the Court in PG&E overruled objections to releases, as the plan did not compel third parties to release whatever claims they could assert, individually or collectively against the released parties, as releases in the PG&E plan were consensual and required an affirmative opt-in by the affected creditor. Here the Debtor is requiring an opt-out rather than the opt-in and affirmative action by creditors in PG&E so that the releases in PG&E did not violate 11 U.S.C.S. § 524(e), which prohibited only nonconsensual third-party releases.

The Debtor in addition to very confusing language in Section 5.6 which includes parties other than the Debtor, attempts in Section 5.5 to release derivative claims. A ruling recently

handed down by the U.S. District Court for the District of Washington reaffirms and extends the proposition that derivative claims cannot be waived by non-debtors. In <u>In re Fraser's Boiler Serv., Inc.,</u> 2019 WL 1099713 (D. Wash. Mar. 18, 2019), the court reversed a bankruptcy court order approving settlement agreements providing for the sale of certain of the debtor's asbestos insurance policies back to the settling insurers free and clear of the claims of non-settling insurers. The district court made the ruling on the basis that the settlement agreements' third-party releases and injunctions were not permissible under Ninth Circuit case law.

Fraser's Boiler Service, Inc. (**"FBS"**) manufactured and installed industrial boilers. FBS ceased operating in 2014 and sold all of its business assets. FBS's boilers contained asbestos. In January 2018, FBS and certain of its insurance companies entered into settlement agreements (the "Settlement Agreements") under which, in exchange for approximately $12 million, the settling insurers would be released from all future liability for asbestos claims against FBS, and actions against the settling insurers would be enjoined. In April 2018, FBS filed for chapter 11 protection in the Western District of Washington to seek approval of the Settlement Agreements, including the releases and the sale of the insurance policies—the company's only remaining assets—back to the settling insurers under section 363(f). The proceeds of the sale were to be contributed to a trust under FBS's proposed liquidating chapter 11 plan. However, because FBS was no longer operating, it did not seek approval of the trust mechanism under section 524(g).

Prior to the bankruptcy filing, FBS's insurers had entered into a cost-sharing agreement (the **"CSA"**) that contained various remedies in the event of a signatory insurer's default, including breach of contract and equitable contribution claims (the **"CSA Claims"**). FBS was not a signatory to the CSA. The non-settling insurers objected to FBS's motion seeking bankruptcy court approval of the Settlement Agreements and the sale of the insurance policies free and clear of the CSA Claims. They argued, among other things, that: (i) under Ninth Circuit precedent, the

bankruptcy court could not enjoin third-party claims under section 105(a) when the requirements of section 524(g) are not satisfied; and (ii) the sale could not be approved under section 363(f) because the CSA Claims were not an "interest" in FBS's property.

The bankruptcy court approved the Settlement Agreements as being reasonable under the standard applied to settlements in accordance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. **Here the Debtor in the Amended Plan or multiple filings, has not even provided any analysis under the In re A&C Properties case as to why the release requested are applicable under 9th Circuit authority**. The court also enjoined the CSA Claims and released the settling insurers. Concluding that the CSA claims were "derivative" of the repurchased insurance policies, the bankruptcy court issued a permanent injunction pursuant to section 105(a).

The bankruptcy court distinguished between enjoining the CSA Claims, on the one hand, and global third-party releases prohibited in the Ninth Circuit, on the other. According to the bankruptcy court, "[T]he crux of the difference is that, unlike releases of all claims against a third party, the supplemental injunction is narrowly tailored to only apply to derivative claims." The court reasoned that the CSA Claims are "derived from the insurance policies being sold back to the [Settling] Insurers free and clear pursuant to the Settlement Agreement[s]" and are therefore "inseparable from the debtor's own insurance policies." The court concluded that, because the injunction affects only derivative claims, it is "not the equivalent of a discharge of a third party." The court also noted that the "injunction does not provide for retention of the asset by the debtor or a purchasing third party, but rather the payment of the cash value of those assets into a liquidating trust that is essential to [FBS's chapter 11 plan]." The nonsettling insurers appealed the order.

The District Court reversed. Initially, the court noted, "any door left open" by American Hardwoods to the validity of third-party injunctions issued in connection with a chapter 11 plan in

the Ninth Circuit "was definitively slammed shut" by <u>Lowenschuss</u>. In <u>Lowenschuss</u>, the District

Court explained, the Ninth Circuit held, "without exception, that § 524(e) precludes bankruptcy

courts from discharging the liabilities of non-debtors." The Ninth Circuit also emphasized

that <u>American Hardwoods</u> "expressly declined to adopt the approach set forth in <u>A.H. Robins</u>."

Finally, according to the district court, the Ninth Circuit reasoned that its position

in <u>Lowenschuss</u> was buttressed by the then recently created section 524(g), which was the single

"narrow exception" to the general prohibition on discharging third-party claims—a position it

reaffirmed in <u>Deocampo v. Potts</u>, 836 F.3d 1134, 1143 (9th Cir. 2016).

These rulings, the District Court wrote in <u>Fraser's Boiler Service</u>, amount to "a rejection of all

exceptions to § 524(e)'s prohibition of enjoining third party claims … [including] the 'derivative'

claims exception from [<u>Manville</u>] that the Bankruptcy Court relied on." Moreover, the District

Court noted that "the Ninth Circuit's interpretation of § 524(e) prohibits not just 'global third-

party releases' but all third-party releases." According to the District Court, more recent

bankruptcy court rulings from within the Ninth Circuit are not persuasive or distinguishable and

do not "run afoul of the broad rule established in <u>American Hardwoods</u> and <u>Lowenschuss</u>"

(discussing <u>In re Yellowstone Mountain Club, LLC</u>, 460 B.R. 254 (Bankr. D. Mont. 2011), and <u>In

re Pac. Gas & Electric Co.</u>, 304 B.R. 395 (Bankr. N.D. Cal. 2004)). Therefore, the District Court

ruled that derivative claims cannot be released by non-consenting parties.

Because the Amended Plan cannot be confirmed for the reasons detailed above, it

confirmation must be denied given the impermissible injunction provisions.

## C. The Amended Plan Unfairly Discriminates Against Equity Holder.

The Debtor is seeking to "cram down" the Amended Plan on Equity Holder, which is impaired under the Amended Plan and will vote to reject it. Subchapter V requires that a plan of reorganization confirmed under section 1191(b) not unfairly discriminate. *See* 11 U.S.C. § 1191(b). Although there does not yet appear to be any reported case law interpreting unfair discrimination under section 1191(b), the unfair discrimination requirement in 1191(b) also appears in section 1129(b)(1), which applies in certain cases under traditional chapter 11. Looking at these two provisions, "the normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (quoting Dep't of Revenue of Ore. v. ACF Indus., Inc., 510 U.S. 332, 341 (1994). Accordingly, it is appropriate to consider case law interpreting section 1129(b)(1)'s unfair discrimination requirement by analogy in discussing unfair discrimination under section 1191(b).

Although the term "discriminate unfairly" is not defined in the Bankruptcy Code, the weight of judicial authority holds that a plan unfairly discriminates only if classes of similar claims are treated differently without a reasonable basis for the disparate treatment. See, e.g., In Tucson Self-Storage, Inc., 166 B.R. 892, 898 (9th Cir. B.A.P. 1994) (explaining that "[a] plan discriminates unfairly if it singles out the holder of some chain or interest for particular treatment," and denying confirmation of a plan that proposed to pay unsecured deficiency claims less that other unsecured claims in full); In re Mcorp Fin., Inc., 137 B.R. 219, 234 (Bankr. S.D. Tex. 1992), *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex. 1992) (explaining that a dissenting class receive "treatment which allocates value to the [dissenting] class in a manner consistent with the treatment afforded to other classes with similar claims against the debtor").

The Amended Plan "discriminates unfairly" with respect to the non-accepting class (Equity Holder and common shareholders) because there is disparate treatment of similar Equity Interests under the Amended Plan with respect to the Debtor. The Amended Plan separately classifies Equity Interests as defined in the Amended Plan against the Debtor without any proper basis. As a result of this classification, the Equity Interest class is not similarly situated to all other Equity Interests against the Debtors.

As set forth in the corporate charter (the "**Charter**") as Exhibit "B" to the Supplemental Declaration Gandhi, for example at Section B. 3., "the holders of Preferred Stock shall vote together, and not separately as a class, with Common Stock and all other shares of stock of the Corporation having general voting power." Thus, the Charter treats this important equity interest on the same basis and does not separate them as the Amended Plan does. Although the Debtor relies on a "Liquidation Event" (Charter, B. 7.) in an attempt to draw a distinction between Common and Preferred, no Liquidation Event has occurred so this provision is irrelevant.

Thus, the Amended Plan discriminates unfairly with respect to Equity Interests of common and preferred shareholders held against the Debtor. In this way, the Amended Plan discriminates unfairly, in its treatment of common shareholders as they are washed away, while preferred shareholders receive new common of the Debtor.

Thus, the Amended Plan "unfairly discriminates" against Equity Holder.

### D. The Amended Plan is Not Fair and Equitable.

Under section 1191, the court must find that the Amended Plan is "fair and equitable" to confirm the Amended Plan. Although section 1191(c) does not state a "fair and equitable" rule specifically for claims and **interest holders**. Instead, it imposes a projected disposable income requirement (sometimes called the "best efforts" test), requires a feasibility finding, and requires that the plan provide appropriate remedies.

The Amended Plan must provide that all of the projected disposable income of the Debtor

to be received in the three-year period after the first payment under the Amended Plan is due, or in such longer period not to exceed five years as the Court may fix, will be applied to make payments under the Amended Plan. The Bankruptcy Code does not define "projected disposable income," but it defines "disposable income" in chapters 12 and 13. In chapter 11 cases, § 1129(a)(15) incorporates the chapter 13 definition.

New § 1191(d) defines disposable income as income that is received by the debtor and that is not "reasonably necessary to be expended" for these specified purposes:

— the maintenance or support of the debtor or a dependent of the debtor; or

…

— payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.

1. **The Debtor Should be considered to have "Disposable Income" During the Amended Plan Period**.

The Debtor should be considered to have "Disposable Income" during the Amended Plan period in which case the common shareholders should receive either distributions on their shares or at least be able to retain interests in the Reorganized Debtor. To date, the Debtor has not generated any meaningful revenue; however the Debtor is "forecasting strong revenue growth going forward". Supplemental Declaration Gandhi ¶ 17. Indeed, the Debtors projection for 2021 is $5,400,000 of revenue, 2022 is $18,800,000 of revenue and for 2023 - $38,500,000 of revenue. No projections were made for the 5 year period after confirmation. Supplemental Declaration Gandhi, Exhibit "D". However, although the Debtor has submitted no evidence or detailed projections on expenses it claims that it will have no disposable income over the next 3 years. This is primarily because it projects without any basis that it will have $7,090,500 (2021), $20,042,750 (2022), and $25,359,387of R&D and Sales & Marketing expenditures during this period. This is just voodoo math generated by the Debtor in its projections to somehow try to substantiate that it will have no disposable income during this period to avoid paying or providing equity to the

common shareholders. The common shareholders were the original investors in this enterprise and should share in its success and robust projections by the Debtor.

The Debtor is essentially using its R&D expenses and Sales & Marketing as a plug to establish a lack of disposable income based upon capital expenditures and development that has already occurred, or the Debtor needs to use its net income to grow the business all without any evidentiary basis to the detriment of the Equity Holder. Interest holders argue that the disposable income they must receive should not be depleted when the Debtor **will gain the benefit of the investment of income in the business**.

Chapter 12 cases have indicated that such use is only permissible in appropriate circumstances. *See, e.g.*, Hammrich v. Lovald (*In re* Hammrich), 98 F.3d 388 (8th Cir. 1996) (affirming confirmation of a plan including a reserve); In re Schmidt, 145 B.R. 983 (Bankr. D.S.D. 1991) (capital reserve permissible only if debtor demonstrates that obtaining financing is not feasible); In re Kuhlman, 118 B.R. 731 (Bankr. D.S.D. 1990) (debtor has burden of proving expenditures reasonably necessary for farming operation and living expenses); In re Janssen Charolais Ranch, Inc., 73 B.R. 125 (Bankr. D. Mont. 1987) (dicta) (reserve is allowable). *But* see Broken BowRanch, Inc. v. Farmers Home Admin. (*In re* Broken Bow Ranch, Inc.), 33 F.3d 1005 (8th Cir. 1994).

An extension of the period that the Debtor must make payments of projected disposable income is appropriate if the Court permits its reduction for a reserve or to grow the business. New § 1191(c)(2) contains no standards for fixing the commitment period. The Court chooses the commitment period which is unique to subchapter V, practice and precedent under the tests in other chapters may not provide guidance. The Court should determine what facts and circumstances justify a longer commitment period and, if so, how much longer the period should be. Here the Debtor has not even provided 5 year projections. It should be easy for the Court to

extend the period, because of the Debtor's deduction from projected disposable income of amounts required for anticipated capital needs and expenses to grow the business. If the Court were to permit such deductions, existing creditors and interest holders are effectively funding the business for the future benefit of the Debtor. An extension of the commitment period maybe an appropriate way for creditors and common shareholders to share in the Debtor's success that depends in part on their involuntary contributions in the form of reduced projected disposable income. *See* 8 COLLIER ON BANKRUPTCY ¶ 1225.04 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019) (stating that in a chapter 12 case, if reserves for capital or other discretionary expenditures are necessary, commitment period is properly extended).

2. **The Amended Plan's Value Does Not Exceed Disposable Income**.

The Amended Plan's value does not exceed disposable income. Contrary to the Debtor's assertions as set forth above, the Debtor's significant projected disposable income over the 3 year period (and likely even greater over the 5 year period if the Debtor had provided those projections), the Debtor without any financial analysis other than stating amounts, values distributions to be made under the Plan as approximately $8.17 million ($1.1 million to unsecured creditors, $3.1 million in value of New Preferred Stock to the DIP Lenders and Bridge Noteholders, and $3 million in value of New Common Stock to Series A Preferred Stock holders). The Debtor has provided no basis or analysis in the Exhibits, Declarations and Amended Plan why the disposable income of the Debtor is less than the value distributed. The Debtor will not distribute more value under the Plan than its projected disposable income assuming that the Court does not include the significant expenditures in its analysis of the Debtors disposable income, or increases the period to 5 years. Consequently, the Plan does not satisfy the requirements of section 1191(c)(2)(B) of the Bankruptcy Code.

E. **The Amended Plan Is Not Feasible.**

The plan is not feasible and does not meet the feasibility requirement of section

1129(a)(11) as well as Subchapter V's new requirement that the Debtor will be able to make all payments under the Plan, or at a minimum, that it is reasonably likely the Debtor will be able to make all payments under the Amended Plan. *See* 11 U.S.C. § 1191(c)(3)(A).

1. **Confirmation is Likely to be followed by Liquidation or Reorganization.**

Section 1129(a)(11) of the Bankruptcy Code requires that "[c]onfirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization[.]" "The feasibility requirement requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." In re Beyond.com Corp., 289 B.R. 138, 145–46 (Bankr. N.D. Cal. 2003) (citing In Re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986)). It is "sufficient to show only that it is more likely than not that the company will succeed" but the debtor need not establish that success is certain. *See* In re Plant Insulation Co., 469 B.R. 843, 868 (Bankr. N.D. Cal. 2012) (citing Acequia, 787 F.2d at 1364). There should not be a substantial delay between confirmation of a plan and its effective date, and if a plan's effective date is contingent, creditors should not be required to bear the risk of such contingency. *See* In re Central Eur. Indus. Dev't Co., 288 B.R. 572, 577–78 (Bankr. N.D. Cal. 2003).

Here, the Debtor's Amended Plan cannot satisfy these standards. The Debtor has submitted commitment letters (the "**Commitments**") (Exhibit "A" to the Second Supplemental Declaration Gandhi), and a form of Stock Purchase Agreement ("**SPA**") (Exhibit "B" to the Second Supplemental Declaration Gandhi) which it purports to state are in an aggregate amount equal or greater than the amount required by the Plan to fund the initial closing of its Exit Capital Raise, and for the Plan to become Effective, before October 16, 2020. However, both the Commitments and SPA are contingent to the "[t]he conditions precedent to the effective date under the Restructuring Plan as provided in the Confirmation Order and the Restructuring Plan shall have been satisfied, and the Confirmation Date (as defined in the Restructuring Plan and Confirmation

Order) shall have occurred." (page 48 of Exhibit "B" to the Second Supplemental Declaration Gandhi). However, under the Amended Plan, a condition to the Effective Date is that "(f) either (x) the Full Term Exit has closed and all proceeds therefrom disbursed to the Debtor or (y) (i) the Debtor, in consultation with the DIP Lender Representative and the Subchapter V Trustee, has elected to pursue the Early Exit and (ii) all further conditions precedent to the Early Exit in Section 2.6(B) have been satisfied."[7] The Full Term Exit is defined as "The Exit Capital Raise will initially seek commitments of not less than $5,000,000 (the "*Full Term Exit*"), subject to increase based on the overall subscription levels as determined by the Debtor in consultation with the DIP Lender Representative."[8] The Debtor has not provided any evidence that it has obtained or will obtain the Exit Capital Raise and it appears without this it will not receive the funding contained in the Commitments.

The Commitments, SPA and the requirements of the Amended Plan demonstrate the Debtor's inability to satisfy the conditions precedent to the Effective Date under the Early Exit and, thus, that the Plan is not feasible. Moreover, as demonstrated in the Debtors projections for the 3 year period following confirmation, the Debtor **will lose $12,187,637** over the 3 year period with negative cash flow (Exhibit "D" to Supplemental Declaration of Gandhi). This amount is so much greater than the Debtors ability to raise capital, which has not been demonstrated as of yet, and therefore can never be made up by the Debtor during this period. Based upon these tremendous loses for a company that over the previous 5 years never made one dollar, it is more likely than not that the Reorganized Debtor will not succeed and a subsequent reorganization or liquidation will occur. The Amended Plan is not feasible.

---

[7] Amended Plan page 29.

[8] Amended Plan page 26.

**F.      The Amended Plan Fails to Properly Classify Interests as Required by Section 1122 of the Bankruptcy Code.**

Without any basis or reason, the Amended Plan separately classifies Equity Holder and other common shareholders interests from other Equity Interests. Remarkably other Equity Interests including former preferred shareholders, Pre-Petition Insider Bridge financiers and the DIP lender are given Equity Interests in the plan while the Equity Holder and other common shareholders are washed away. Equity Holders class of common shareholders has been deemed to reject the Amended Plan. The Amended Plan provides at section 9.46 that "**Equity Interest**" are defined as "[A]n ownership interest in the Debtor, including the Common Equity Interests, the Series A Preferred Stock, or rights or interests linked to the same or any other ownership interests in the Debtor, including options, warrants, or other agreements or rights to acquire the same." Based upon this definition in the Amended Plan there is no fundamental difference between the Equity Holders common share interest and any other holder of equity including preferred shareholders. Therefore, they all should be classified together in the Amended Plan to meet the requirements for confirmation.

As set forth in the corporate charter (the "**Charter**") as Exhibit "B" to the Supplemental Declaration Gandhi, for example at Section B. 3., "the holders of Preferred Stock shall vote together, and not separately as a class, with Common Stock and all other shares of stock of the Corporation having general voting power." Thus, the Charter treats this important equity interest on the same basis and does not separate them as the Amended Plan does. Although the Debtor relies on a "Liquidation Event" (Charter, B. 7.) in an attempt to draw a distinction between Common and Preferred, no Liquidation Event has occurred so this provision is irrelevant.

11 U.S.C. § 1122 permits a plan to place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The

Amended Plan clearly _does not_ satisfy this requirement as it provides for the creation and treatment of classes of claims.

The classification of claims under a plan is proposed by the debtor proposing the plan (or other plan proponent). *See* 11 U.S.C. § 1123(a)(l). Bankruptcy Code section 1122 provides that claims or interests within a given class must be "substantially similar." 11 U.S.C. § 1122(a). A claim that is not substantially similar to other claims may not be classified with those claims. Steelcase v. Johnston (In re Johnston), 21 F.3d 323, 327-28 (9th Cir. 1994). To determine whether claims are substantially similar, "bankruptcy court judges must evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims." *Id.* at 327.

A claim that is substantially similar to other claims may be classified separately from those claims, even though section 1122(a) does not say so expressly. Barakat v. Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1524-25 (9th Cir. 1996). Substantially similar claims may be classified separately if there is a "legitimate business or economic justification" for doing so. *Id.* at 1526. Separate classification for the sole purpose of obtaining acceptance of a class of creditors under the plan constitutes "gerrymandering" and is not permitted. *Id.* Subject to these limitations, bankruptcy courts have discretionary authority to approve a debtor's proposed classification scheme. *See* In re Johnston, 21 F.3d at 327; *cf* In re Palisades-On-The-Desplaines, 89 F.2d 214, 217 (7th Cir. 1937) (noting that Congress intended to give the court "broad latitude" in classifying claims under analogous provision of the former Bankruptcy Act).

Applying these principles, the Ninth Circuit Court of Appeals, in In re Johnston, affirmed the bankruptcy court's decision that a creditor's claim was not substantially similar to those of other unsecured creditors because (i) the creditor was embroiled in litigation with the debtor that could result in the creditor's claim being offset or exceeded by damages in favor of

the debtor and (ii) the creditor was partially secured. 21 F.3d at 327. In In re Barakat, the Ninth Circuit rejected the separate classification of a lender's unsecured deficiency claim from the claims of other unsecured creditors. 99 F.3d at 1523-26. The court of appeals concluded that the unsecured deficiency claim was substantially similar to other unsecured claims (i.e., trade vendor claims), and noted the bankruptcy court's finding that the debtor failed to offer a business or economic justification for the separate classification. Id. at 1523.

In In re Barakat the Ninth Circuit also had occasion to consider whether the bankruptcy court erred in denying separate classification to trade creditors that continued to do business with the debtor post-petition. Id. at 1528-29. The debtor argued that the separate classification was "justified because trade creditors expect to earn profits from future dealings with Debtor." Id. at 1528. The court of appeals, however, rejected this argument, noting the bankruptcy court's observation that "literally thousands of companies are available to provide the services' of the trade creditors, thus none of the trade creditors were essential to Debtor's continued maintenance of the apartment building." Id. at 1529. The court of appeals affirmed the bankruptcy court's decision, holding (i) there was no legal distinction between trade creditor claims and other general unsecured claims, and (ii) the factual basis of the bankruptcy court's classification decision had not been challenged. Id.

In support of its analysis, the Ninth Circuit cited Boston Post Rd. Ltd. Partnership v. FDIC (In re Boston Post Rd. Ltd. P'ship), 21 F.3d 477,483 (2d Cir. 1994), in which the court affirmed the decisions of the lower courts not to permit the separate classification of trade creditors and the unsecured deficiency claim of the Federal Deposit Insurance Corporation ("**FDIC**"). The debtor had argued, among other things, that its future viability as a business depended on its treating its trade creditors more favorably than the FDIC. But the debtor

"failed to present any evidence of a legitimate business reason for the separate classification of similarly situated unsecured creditor claimants." *Id.* As the court explained further:

> The trade creditors in Class 4 were few and consisted of a landscaper, property appraisers, rubbish removers, and accountants. None were essential to BPR's future. Both lower courts accordingly found an absence of a valid justification for the isolation of the FDIC deficiency claim. No evidence to the contrary was adduced.

**In this case, there is no economic or business justification for the separate classification. The Debtor does not demonstrate the economic or business justification for other Equity Interests to retain new common share interests. There is no showing that such justification is "critical," "essential," or "necessary" to the Debtor's reorganization. The purpose of this separate classification is to provide preferential treatment to specified Equity Interests.**

The Ninth Circuit Court of Appeals has not squarely addressed this legal issue. In <u>In re Barakat</u>, the debtor argued that the interests of trade vendors in conducting future business with the debtor justified their separate classification from the claim of the FDIC. The court rejected this argument and found no error on appeal because the debtor did not challenge the factual basis of the bankruptcy court's classification decisions. 99 F.3d at 1529. The court of appeals noted the bankruptcy court's observation that none of the trade creditors was "essential," but the court of appeals was not required under the circumstances to rule, and did not actually rule, whether this was the appropriate legal standard for assessing the separate classification of vendor claims. *Id.* Nor did the Second Circuit Court of Appeals reach the issue in <u>In re Boston Post Rd. Ltd. P'ship</u>. There, the debtor "failed to present any evidence of a legitimate business reason for the separate classification...." 21 F.3d at 483. As such, the Second Circuit had no occasion to determine when the separate classification of trade vendor claims is supported by a legitimate business or economic reasons. However, by requiring that the

business or economic justification be "legitimate," the Ninth Circuit made clear that the justification offered must be genuine. *See* Merriam Webster's Collegiate Dictionary (10th ed., 1996) at 664 ("legitimate" defined as "being exactly as purposed: neither spurious nor false"). A justification that is illogical, based on false premises or bearing no logical relationship to the facts and circumstances presented obviously would not be "legitimate." Here that is the case.

Further, 11 U.S.C. § 1123(a)(4) (a plan must "provide the same treatment for each claim or interest of a particular class unless the holder of particular claim or interest agrees to a less favorable treatment of such particular claim or interest"). The Fifth Circuit has held that there is "one clear rule that emerges from otherwise muddled case law on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III), 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821 (1992). This rationale has been adopted by the Ninth Circuit as well:

> We agree with the principles enunciated in the Greystone III line of cases, that is, absent legitimate business or economic justification, it is impermissible for Debtor to classify LICV's deficiency claim separately from general unsecured claims.
> Barakat v. the Life Insurance Company of Virginia, 99 F.3d 1520 (9th Cir. 1996).

The classification of Equity Interests under the Amended Plan is not proper and not in accordance with section 1122. Moreover, no legitimate business reason exists for the placement of how the Equity Holders Equity Interest is separately classified from others of a similar legal character. Thus, an improper purpose exists and the Amended Plan cannot be confirmed.

## III.

## CONCLUSION

For the foregoing reasons, the Equity Holder requests that the Court deny confirmation, such other relief as the Court deems just and appropriate.

1    DATED:  September 18, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KOGAN LAW FIRM, APC**
Michael S. Kogan


By:  /s/Michael S. Kogan
Michael S. Kogan
Attorneys for Masoud Toghraie.