BAO M. VU (SB #277970)
bao.vu@stoel.com
THOMAS A. WOODS (SB #210050)
thomas.woods@stoel.com
ANDREW H. MORTON (*admitted pro hac vice*)
andrew.morton@stoel.com
STOEL RIVES LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone: 916.447.0700
Facsimile: 916.447.4781

*Counsel for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>CROSSCODE, INC.,<br><br>         Debtor. | Case No. 20-30383<br><br>Chapter 11<br><br>DECLARATION OF ROBERT C. CLIFFORD IN SUPPORT OF CONFIRMATION OF DEBTOR'S SECOND AMENDED CHAPTER 11 (SUBCHAPTER V) PLAN OF REORGANIZATION DATED OCTOBER 8, 2020 |

Pursuant to 28 U.S.C. § 1746, I, Robert C. Clifford, declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

**I.  BACKGROUND & EXPERIENCE**

1.  I submit this declaration (the "***Declaration***") in support of confirmation of the *Debtor's Second Amended Chapter 11 (Subchapter V) Plan of Reorganization Dated October 8, 2020* [Dkt. No. 167] (the "***Plan***"). The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information reviewed by me in the course of my duties and responsibilities. If called upon to testify, I would testify to the facts set forth in this Declaration. Unless otherwise noted, capitalized terms used in this Declaration have the meanings ascribed in the Plan.

DECLARATION OF ROBERT C. CLIFFORD     -1-

2. I am a member and the chairman of the Board of Directors of Crosscode, Inc. (the "***Debtor***" or "***Crosscode***"), the debtor and debtor-in-possession in the above-captioned chapter 11 Case (the "***Chapter 11 Case***").

3. I am also a Founding Principal of Liquid Venture Partners ("***LVP***"), which conducts investment banking business through National Securities Corporation. Since and prior to founding LVP, I have been working in the capital formation industry for over 30 years. In that capacity, I evaluate the commercial potential of, identify potential sources of financing for, and make large investments in businesses such as and including the Debtor's.

4. Since its inception in 2014, LVP has successfully led and closed 24 transactions, many of which were for pre-revenue companies, raising approximately $340 million in the process. We have relied on our core investor base for supplying the funds for all of these. In financings where we have sought to raise additional equity funding for companies in which LVP has led a previous investment, all have successfully closed on the total offered amount or range of funding within a few months of formally marketing the offering to prospective investors.

5. In general, a new round of financing for pre- and early-revenue companies is sized to provide sufficient funding to meet the company's forecast operating costs and working capital needs for a period of between 18 and 36 months. The company would then raise additional funds in future financing rounds, as needed. This cadence allows early stage companies and their investors to plan for and evaluate the business's growth, development, and future capital needs at regular intervals during which forecasts of future costs and revenues can reasonably be projected.

6. In the spring of 2019, LVP led and closed a financing on behalf of Crosscode, in the form of $9.25mm of Series A Preferred Stock. The Series A Preferred Stock was purchased by 169 accredited investors, many of whom are well-known to LVP and have co-invested in multiple other LVP-led financings. The 2019 financing was the first LVP-led financing in Crosscode. In that offering, we formally began marketing to investors, most of whom had previously invested in LVP-led financings, on or about April 2019. The offering successfully closed and Crosscode was funded in May 2019.

7. By early 2020, Crosscode was in need of additional financing to fund its operations during the to-be-filed Chapter 11 Case. On April 13, 2020, Crosscode launched its solicitation of subscriptions to provide loan commitments under the DIP Facility.

8. LVP was not a formal financial sponsor on the DIP Facility and did not receive any compensation as a result of its closing. LVP also did not participate in pricing the transaction. Nevertheless, I and my partners in LVP, as individual investors, helped Crosscode reach out to the solicited existing Series A Preferred stockholders. Despite the substantial investment risk and further declining economic conditions due to the COVID-19 pandemic, Crosscode successfully obtained subscriptions in excess of and, following approval by the Court on May 12, 2020, fully funded the offered $2,755,400 DIP Facility. Approximately 80% of the existing Series A Preferred stockholders participated in the DIP Facility and now comprise the DIP Lenders in this Chapter 11 Case.

## II. THE DEBTOR'S EXIT AND POST-BANKRUPTCY CAPITAL RAISE

9. The Debtor proposes to exit bankruptcy using funds from an initial closing of funding under the Exit Capital Raise described in the Plan. Immediately after the Effective Date of the Plan, Reorganized Crosscode intends to engage LVP and National Securities Corporation ("**Investment Bankers**") for the purpose of conducting the expanded marketing and closing its subsequent post-bankruptcy Capital Raise (the "**Post-Bankruptcy Capital Raise**"), the proceeds of which, together with the initial closing of the Exit Capital Raise, will allow Reorganized Crosscode to continue funding and expanding its operations, business, and revenues for at least 18 months after the Effective Date, paving the way for its successful future financings and business growth.

10. In anticipation of confirmation of its Plan, the Debtor has prepared the necessary offering documents and agreements to support the Exit Capital Raise, including the ongoing Post-Bankruptcy Capital Raise. The form of stock purchase agreement and other offering materials will be substantially similar to those provided in connection with the Commitment Letters for the initial closing of the Exit Capital Raise. *See* Third Supp. Gandhi Decl.,[1] ¶ 17 (attaching copies of the

---

[1] Contemporaneously with this Declaration, the Debtor filed the *Third Supplemental Declaration of Rahul Gandhi in Support of Confirmation of Debtor's Second Amended*
STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

DECLARATION OF ROBERT C. CLIFFORD     -3-

108266655.2 0072141-00003

Case: 20-30383   Doc# 169   Filed: 10/08/20   Entered: 10/08/20 23:47:33   Page 3 of 6

1 Commitment Letters and Purchase Agreement for participation in the initial closing of the Exit Capital Raise).

11. At the September 3, 2020 hearing on confirmation of the Debtor's Plan, the Court requested additional evidence of, among other things, the likelihood that the Debtor would be able to raise the funds required to satisfy the conditions precedent to the Plan's Effective Date. In order to provide that assurance, the Debtor and its attorneys prepared revised forms of the Exit Capital Raise disclosure documents and stock purchase agreement for the purpose of formally soliciting and obtaining binding investment commitments before the entry of any order confirming the Plan. At that time, the Debtor projected it would require approximately $2.6 million in order to fully fund the Plan and trigger the Effective Date. I and other members of the Debtor's Board of Directors reached out to several of the Debtor's existing and largest investors to solicit and successfully obtain binding Commitments in the aggregate amount of $2.645 million, copies of which the Debtor filed with the Court on September 11, 2020.

12. Further to the continued hearings held on confirmation of the Debtor's Plan on September 23 and October 5, 2020, the Debtor now forecasts that the Plan, if confirmed, would have an Effective Date in mid-November. As the Debtor continues to operate during this Chapter 11 Case, it draws funds from available commitments under the DIP Facility, the remainder of which will, in part, fund the Plan. Consequently, the Debtor now forecasts that it must raise approximately $600,000 of additional funds the initial closing of the Exit Capital Raise in order to fully fund the Plan. Again, the Debtor was able to obtain increased and additional commitments in excess of that amount, copies of which were filed contemporaneously with this Declaration. *See* Third Supp. Gandhi Decl., ¶¶ 17–18, Ex. 3.

13. After the Effective Date, with the assistance of its Investment Bankers, Reorganized Crosscode intends to begin marketing efforts for the Post-Bankruptcy Capital Raise within a few days after the Effective Date.

---

*Chapter 11 (Subchapter V) Plan of Reorganization Dated October 8, 2020* (the "**Third Supp. Gandhi Decl.**")

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

DECLARATION OF ROBERT C. CLIFFORD    -4-

Case: 20-30383   Doc# 169   Filed: 10/08/20   Entered: 10/08/20 23:47:33   Page 4 of 6

108266655.2 0072141-00003

14. The Debtor and the Investment Bankers anticipate that Reorganized Crosscode will solicit investors who have previously invested in Crosscode, including investors that participated in the DIP Financing and the Exit Capital Raise, as well as additional accredited investors who have existing relationships with the Investment Bankers, but have not previously invested in Crosscode.

15. Based on numerous initial discussions with existing and prospective investors and consultations with the Debtor's Board of Directors and officers, Reorganized Crosscode will seek to raise between $4.5 and $6 million in additional equity funding through the Post-Bankruptcy Capital Raise. The Post-Bankruptcy Capital Raise will be held to open to solicited investors for approximately one month.

16. According to the Debtor's projections, the Post-Bankruptcy Capital Raise, with the Exit Capital Raise, will fund Reorganized Crosscode's ongoing operations for at least 18 months from the Effective Date. As described above, the size of the Exit and Post-Bankruptcy Capital Raises and timing for when Reorganized Crosscode would need to seek a further round of financing is consistent with customary practices, my own experience, and my knowledge of what current and future investors would expect in the Debtor's industry.

17. Based on my professional experience leading similar investments, discussions with prospective investors in the Post-Bankruptcy Capital Raise, and my extensive familiarity and involvement with Crosscode's business and previous equity financings, including obtaining and increasing the Commitments for the initial closing of the Exit Capital Raise, I believe it is overwhelmingly likely that Reorganized Crosscode will successfully close Post-Bankruptcy Capital Raise in an amount and within the time frame described above.

## III. THE FEASIBILITY OF THE DEBTOR'S POST-BANKRPUTCY CAPITAL RAISE

18. As a member of the Debtor's Board of Directors and based on my previous experience with capital raises similar to the Post-Bankruptcy Capital Raise, I am in a unique position to speak to the likelihood that the Post-Bankruptcy Capital Raise will, in fact, succeed. Since forming LVP over 6 years ago, I have never failed to close a round of investment that our firm has launched.

STOEL RIVES LLP
ATTORNEYS AT LAW
SACRAMENTO

DECLARATION OF ROBERT C. CLIFFORD     -5-

108266655.2 0072141-00003

Case: 20-30383   Doc# 169   Filed: 10/08/20   Entered: 10/08/20 23:47:33   Page 5 of 6

19. The Investment Bankers will solicit reliable, consistent, and sophisticated investors, all of whom are accredited and many of whom have previously invested and expressed interest in continuing to invest in Crosscode and Reorganized Crosscode.

20. As described above, the Debtor successfully raised nearly $3 million for the its DIP Facility in less than one month in anticipation of this bankruptcy case. These DIP Facility funds were raised promptly despite various difficulties and complications, including the cloud of the costs of litigation with its former CEO that threatened to overwhelm the operating budget of a startup otherwise poised for great success.

21. Through its Chapter 11 Case, the Debtor has been able to settle that threat of perpetual litigation with its former CEO and worked very hard to build consensus with creditors, interest holders, and other parties-in-interest, such that the Debtor has now been able to propose its second amended—and expected to be *fully* consensual—Plan. With the Plan confirmed, the Debtor will have a clean balance sheet and resolution of the litigation, costs, and uncertainties that necessitated the Debtor's filing of the Chapter 11 Case. The Debtor and Reorganized Crosscode will be able to fully fund the Plan, paying all creditors in full, give prospective investors certainty and confidence in its business, and be extremely well positioned to solicit and obtain additional equity investments through the Post-Bankruptcy Capital Raise.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct and that this declaration was executed at Pacific Palisades, California on this 8th day of October, 2020.

By: */s/ Robert C. Clifford*
Robert C. Clifford