WILLIAM E. WINFIELD (State Bar #122055)
KEITH H. FICHTELMAN (State Bar #262476)
**NELSON COMIS KETTLE & KINNEY LLP**
300 E. Esplanade Drive, Suite 1170
Oxnard, California 93036-0238
Telephone: (805) 604-4106
Facsimile: (805) 604-4150
Email: wwinfield@calattys.com
Email: kfichtelman@calattys.com

Attorneys for Paras Bhende, Vikram Namjoshi
and Masoud Toghraie.

# UNITED STATES BANKRUPTY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In Re:<br><br>CROSSCODE, INC.,<br><br>    Debtor | Case No.: 20-30383<br>CHAPTER 11<br><br>OBJECTION TO CONFIRMATION OF SECOND AMENDED CHAPTER 11(SUBCHAPTER V) PLAN OF REORGANIZATION DATED OCTOBER 8, 2020<br><br>Hearing:<br>Date: October 29, 2020<br>Time: 9:30 a.m.<br>Place: Courtroom 17, 16th Floor |

    Paras Bhende, Vikram Namjoshi, and Masoud Toghraie (collectively, "Equity Holders"), holders of common shares in Crosscode, Inc., hereby file their objection to confirmation of Crosscode, Inc.'s Second Amended Chapter 11 (Subchapter V) Plan of Reorganization dated October 8, 2020 (the "SAP"), and respectfully states as follows:

# I.
# INTRODUCTION

The SAP should be rejected by the Court. Through the SAP, the Debtor, Crosscode, Inc. (the "Debtor" or "Crosscode"), has barely even attempted to remedy the significant deficiencies in its previously submitted plans for reorganization and the SAP still remains a bad faith attempt to strip common shareholders, including Equity Holders, of their equity in Crosscode without any economic or business justification for doing so.

Confirming the SAP will result in an unfair and inequitable result and impermissibly discriminate against, among others, Equity Holders. Besides the class of common shareholders, the only other two classes of supposedly impaired interests consist primarily of corporate insiders or related interests. The corporate insiders, who provided the majority of the bridge notes, are receiving full value for their investment in the form of new preferred stock. The other class of impaired claims, the holders of preferred stock, are receiving full value for their interests by essentially just swapping their preferred stock for new common shares.

In the end, the only class who is truly suffering any detriment through the SAP is the class of common shareholders. The very same shareholders who provided the initial funding and capital for Crosscode to ever exist. The very same shareholders who invested in nothing more than an idea and are now being excluded from the company at the very moment that they would have started to see a potential return on their investment. Now, right at the moment that the Debtor was expected to have revenues finally begin streaming into the company in late 2020 with substantial revenues expected in 2021 and 2022, the common shareholders are being asked to watch their equity stake completely washed away in exchange for a token financial payment.

The SAP makes clear that this bankruptcy is essentially a sham being perpetrated by corporate insiders and their investment bank, Liquid Venture Partners

("LVP"), in order to complete their takeover of Crosscode at the expense of common shareholders. Shortly after LVP's reconstitution of Crosscode's board of directors and ouster of Crosscode's founder, LVP terminated preparations to take the company public, thus ensuring LVP would remain in control of the company with limited public oversite. The Debtor then proceeded to pay substantial bonuses to insiders in early 2020 and paid for first class travel for an insider's trip to India. All this was in preparation to then claim that Crosscode was insolvent and force the extinguishment of common shareholders' equity in the company through these proceedings.

The bad faith intent of the SAP is further laid bare by the Debtor's stated intention to raise funds in the immediate future from LVP's preferred investors rather than the Debtor's current investors. Despite assurances from the Debtor, included in the SAP, that the "Debtor will consider investment from the Common Equity Interest Representative in connection with future equity financing" (Dkt. 172 at p. 16), the Debtor has indicated that it intends to raise nearly $3.3 million based on commitments from company insiders, a Vice President of LVP, and a "longstanding client of LVP." (Dkt. 168 at ¶ 20).

Finally, the Debtor still has made no material efforts to explain why common shareholders are receiving disparate treatment from holders of preferred stock. While such holders of preferred stock are being made whole through issuance of new common shares, current common shareholders' equity is being completely extinguished. There is no economic or business justification for this disparity in treating these two similarly situated classes.

The Court should deny Debtor's request for confirmation of the SAP.

## II.

## BACKGROUND AND PROCEDURAL HISTORY

Toghraie previously objected to the Debtor's original plan for reorganization as well as the Debtor's amended plan. (*See* Dkt. Nos. 132 and 156). Bhende and Namjoshi previously provided informal objections to the Debtor's original plan for

NELSON COMIS KETTLE & KINNEY LLP
300 Esplanade Drive, Ste. 1170
Oxnard CA 93036

reorganization through an email to the Court on September 11, 2020. (*See* Dkt. No. 154). Yet another informal objection was sent via email by Todd Bublitz on September 5, 2020. (Dkt. No. 152). Equity Holders have not withdrawn any of their prior objections and reassert them as still relevant to the SAP. In particular, contrary to assertions in the SAP (*see* Dkt. 172, p. 19), Toghraei's objections have not been adequately resolved.

The Debtor was formed in 2015 by its founder Aditya Sharma. (Declaration of M. Toghraie (Dkt. No. 133) ¶ 3). In 2017, the Debtor registered with the Securities and Exchange Commission in preparation for eventually making a public offering. (Second Declaration of M. Toghraie ("2nd Toghraie Decl.") (filed concurrently herewith).[1] In or about November 2019, LVP made a $9.3 million investment in the Debtor through the purchase of a series A preferred capital offering. (Dkt. No. 133 at ¶ 3). Soon thereafter, LVP reconstructed the Debtor's board of directors, fired its founder, and ousted him from the board of directors. (*Id.*). Further, LVP's selected CEO withdrew the Debtor's registration statement with the SEC. (2nd Toghraie Decl.).

Subsequently, the Debtor approved, and paid substantial bonusses to insiders. (2nd Toghraie Decl.). The Debtor also paid for an insider's first class travel to India. (2nd Toghraie Decl.). Shortly thereafter – about two weeks prior to the filing of its petition in this case, the Debtor entered into secured insider financing transactions with six of its preferred shareholders (the "Pre-Petition Insider Bridges Financing") and post-petition financing from a group of which 80% were insider preferred shareholders (the "Insider DIP Financing"). The Pre-Petition Insider Bridge Financing is essentially the Debtor's only secured claims in this case.[2]

---

[1] A number of publicly available documents regarding the Debtor's SEC registration are available online at https://sec.report/CIK/0001731362. It is appropriate for the Court to take judicial notice of such filings. *See Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2013) (holding it is appropriate for courts to take judicial notice of publicly available information in SEC filings).

[2] The only other secured claim is for $268 owed. (Dkt. No. 172).

As noted in the SAP, the Debtor has been able to consistently meet its ongoing obligations. (SAP [Dkt. No. 172] at p. 13). As a pre-revenue entity, the Debtor has relied on outside investments to fund its operations. (*Id.* at pp. 12-13). The Debtor has not offered any evidence that it has ever experienced problems raising such outside capital. Indeed, less than a year ago LVP invest over $9 million in the Debtor and the Debtor has apparently received commitments from numerous individuals that they intend to invest nearly $3.3 million in the near term in what is supposedly a bankrupt enterprise. (*See* Third Supplemental Declaration of Rahul Gandhi [Dkt No. 168] ¶ 18). The Debtor has projected that it would begin to realize significant revenue during the fourth quarter of 2020. (*Id.* at p. 12). From there, the Debtor has projected that revenue will increase substantially over the next three years. (Supplemental Declaration of Gandhi [Dkt. No. 151] ¶ 17). The Debtor projects revenues of $5.4 million in 2020, $18.8 million in 2022, and $38.5 million for 2023. (Suppl. Decl. of Gandhi, Exh. D [Dkt No. 151-1]).

## III.
## THE SECOND AMENDED PLAN SHOULD BE REJECTED

Equity Holders previously objected to the Debtor's prior plans for reorganization. (*See* Dkt Nos. 132, 154 & 156). The SAP has not remedied those deficiencies or otherwise provided a valid basis for the Court to confirm the SAP over Equity Holders' objections.

As the proponent of the SAP, Debtor bears the burden of proving that the plan satisfies the relevant provisions of the Bankruptcy Code. *See In re Kemp,* 134 B.R. 413 (Bankr. E.D. Cal. 1991).

Specifically, and as similarly discussed in Equity Holders' objections to the prior proposed plans, the SAP unfairly discriminates against Equity Holders, the SAP improperly classifies interests, the SAP is not fair and equitable, the SAP may not be feasible, and the SAP includes impermissible injunctions and released claims.

Furthermore, rejecting the SAP would be a proper use of the Court's equitable powers to prevent Debtor from extinguishing Equity Holders' interests in bad faith.

### A. The SAP Unfairly Discriminates Against Equity Holders

In order for the Court to confirm the SAP, the SAP must not unfairly discriminate against a class of interests. *See* 11 U.S.C. § 1191(b). When addressing the issue of unfair discrimination, bankruptcy courts have generally found that a plan unfairly discriminates if it treats similar claims differently without a reasonable basis for doing so. *See, e.g., In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. B.A.P. 1994) (holding that a plan cannot single out the holder of an interest similar to other claims and provide them less than other similarly situated claims); 7 Collier on Bankruptcy, ¶ 1129.03 (3)(b) (a "class must not only receive 'fair and equitable' treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor").

Here, there can be no question that Equity Holders and the other common shareholders are facing discrimination *vis-à-vis* holders of other equity interests in the company. Such other equity interests are receiving continuing equity in Debtor post confirmation of the SAP while common shareholders are seeing their equity extinguished in exchange for a comparatively small financial payment.

Bankruptcy Courts in the Ninth Circuit employ a four part test to determine if discrimination of an interest is unfair. *In re Wolff,* 22 B.R. 510, 512 (9th Cir. B.A.P. 1982); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Pshp. (In re Ambanc La Mesa Ltd. Pshp.)*, 115 F.3d 650, 656 (9th Cir. 1997). Specifically, Debtor must satisfy that:

> (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. Restating the last element, does the basis for the discrimination demand that this degree of differential treatment be imposed?

*In re Wolff*, 22 B.R. at 512.

Here, Debtor cannot pass this test. There is no reasonable basis for the discrimination. Debtor has not offered any explanation, much less a reasonable one, as to why Equity Holders and the other common shareholders cannot retain equity in the reconstituted Debtor. Indeed, as at least one court has noted, one of the primary benefits of Subchapter V reorganization is "the elimination of the absolute priority rule, which allows equity holders to retain their ownership interests without paying all creditors in full." *In re Easter*, 2020 Bankr. LEXIS 2830, at *11 (Bankr. N.D. Miss. Oct. 9, 2020). Indeed, here, essentially all of Debtor's creditors are proposed to receive full payment in cash or equity. The only impaired class proposed to receive less than full value are the Class 4 preferred stockholders who are still to receive continued equity. There is no reasonable basis that common shareholders should not also retain equity in Debtor. Further, Debtor has offered no reason that it could not carry out the SAP without the proposed discrimination.

Next, it is clear that the discrimination is not in good faith. As discussed above, it appears that this entire bankruptcy was engineered in bad faith. This bankruptcy follows LVP's reconstitution of the Debtor's board of directors and ouster and firing of Debtor's founder. This was followed by substantial bonuses paid to insiders and incurring substantial expenses to justify the Pre-Petition Insider Bridges Financing. In the end, this whole scheme seems to have been designed to increase LVP's hold on the company and reward insiders and LVP's preferred stockholders with greater share of equity in Debtor. The extinguishment of all equity owned by the common shareholders appears to be a bad faith continuation of this scheme.

The SAP unfairly discriminates against Equity Holders and the other common shareholders. The SAP should not be confirmed.

### B. The SAP is Not Fair and Equitable

Section 1191 requires that a reorganization plan be "fair and equitable." Section 1191(c) provides that

OBJECTION TO CONFIRMATION OF 2ND AMENDED PLAN OF REORGANIZATION
- 7 -

Case: 20-30583    Doc# 199    Filed: 10/22/20    Entered: 10/22/20 19:18:34    Page 7 of 16

the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:

…

(2) As of the effective date of the plan—

(A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan

11 U.S.C. §1191(c).

Section 1191(d) providers that "disposable income" "means the income that is received by the debtor and that is not reasonably necessary to be expended . . . for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor."  11 U.S.C. §1191(d).

Here, Debtor will almost assuredly have some level of "disposable income" in at least the next five years, if not the next three.  Debtor has projected that it will generate over $60 million in revenue by the end of 2023.  (Suppl. Decl. of Gandhi, Exh. D [Dkt No. 151-1]).  Debtor, however, claims it projects a loss over that same time period.  But such loss is the result of projected R&D and Sales & Marketing expenditures totaling over $7 million in 2021, over $20 million in 2022, and over $25 million in 2023.  (*Id.*).  No basis is provided for these projections.

It is impossible for Debtor to claim that such drastically increased R&D and Sales & Marketing expenditures are "*necessary* for the continuation, preservation, or operation of" Debtor's business.  *See* 11 U.S.C. §1191(d).  This is especially true based on representations made on behalf of Debtor in Rahul Gandhi's most recent declaration.  In his Third Supplemental Declaration, while arguing for the feasibility of the SAP, Gandhi represents it is within Debtor's capabilities to "slow or otherwise manage our costs to keep our cash burn in the desired range."  (3rd Suppl. Decl. of Gandhi [Dkt. No. 168] ¶ 25).  If Debtor is capable of slowing and otherwise managing

its costs to manage cash burn, it bears questioning whether such costs are "*necessary for the continuation, preservation, or operation of*" Debtor's business. *See* 11 U.S.C. §1191(d).

Instead, it appears that Debtor intends to use its disposable income to grow its business, not simply to continue, preserve, or operate its business. It would not be fair and equitable to allow Debtor to use its projected income for that purpose while extinguishing the interests of Equity Holders and the other common shareholders.

The Court should consider that the Debtor will have disposable income within the next five years, if not the next three. At that point, the SAP is not "fair and equitable" pursuant to Section 1191 and should not be confirmed.

### C. The SAP is not Feasible

Section 1129(a)(11) of the Bankruptcy Code requires that "[c]onfirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization[.]" "The feasibility requirement requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Beyond.com Corp.*, 289 B.R. 138, 145-46 (Bankr. N.D. Cal. 2003) (*citing In Re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986)). There should not be a substantial delay between confirmation of a plan and its effective date, and if a plan's effective date is contingent, creditors should not be required to bear the risk of such contingency. *See In re Central Eur. Indus. Dev't Co.*, 288 B.R. 572, 577-78 (Bankr. N.D. Cal. 2003).

Debtor has yet to make an appropriate showing that it can meet these standards. Debtor claims in the SAP that it was forced into bankruptcy because "it became increasingly clear to the Debtor that it would be unable to access capital markets to raise necessary funding." (SAP [Dkt No. 167] § 1.7]). Debtor has not offered any explanation as to how the reorganization will help it access such capital markets in the future. This will especially be true for a company that failed to realize any cognizable revenue, has already gone through bankruptcy restructuring, and, based on its own

NELSON COMIS KETTLE & KINNEY LLP
300 Esplanade Drive, Ste. 1170
Oxnard CA 93036

projection, will continue losing between $300,000 and $500,000 for each of the next 18 months. (3rd Suppl. Decl. of Gandhi [Dkt. No. 168] ¶ 25). Yet, Debtor estimates it will need to raise between $4.5 and $6 million in order to maintain operations for 18 months. (*Id.* at ¶ 24). If such a goal is so easily obtainable for Debtor, it certainly begs the question as to why this bankruptcy was necessary and why Equity Holders' interest in the company must be extinguished in order for the Debtor to emerge from bankruptcy.

### D. The SAP's Injunctions and Released Claims Are Improper

The SAP contains releases of claims held by non-debtor third-parties against other non-debtors, which would require affirmative (or opt-in) consent, and thus are impermissible under the Bankruptcy Code and applicable case law, including recent decisions by the Ninth Circuit in *Blixseth v. Credit Suisse (In re Blixseth)*, 961 F.3d 1074 (9th Cir. 2020) and by this Court in *In re PG&E Corp.*, Case No. 19-30088-DM, 2020 Bankr. LEXIS 1586 (Bankr. N.D. Cal. June 17, 2020). The Plan contains impermissible (a) releases of rights and causes of action held by the Debtor (Plan Section 5.5); (b) injunctions with respect to the assertion or enforcement of (i) Claims or Equity Interests that were held against or in the Debtor or (ii) direct or derivative Claims released pursuant to the Plan (Plan Section 5.6); and to which the Debtor provided only voting and non-voting parties-in-interest an opportunity to opt-out of rather than opt-in as this Court has previously ruled in the PG&E case.

The Amended Plan provides at section 9.65 that "Released Parties" are:

> Individually and collectively, the Debtor's Representatives, the Subchapter V Trustee (solely in his capacity as such), the DIP Lenders, the DIP Lender Representative, Aditya Sharma, Anshu Sharma, and the Representatives of each of the foregoing (solely in their capacities as such).[3]

---

[3] The language in this section remains unchanged from the Amended Plan. *See* Dkt. No. 172.

NELSON COMIS KETTLE & KINNEY LLP
300 Esplanade Drive, Ste. 1170
Oxnard CA 93036

The Amended Plan provides for injunctions against non-debtor parties from bring actions against non-debtor parties at section 5.6 as follows:

> On the Effective Date, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against or affecting Reorganized Crosscode, the Debtor, the estate, their property, *any disbursing agent under the Plan, the Plan Fund, or any of their respective current or former members, directors, managers, officers, employees, agents, trustees, professionals or successors and assigns or their respective assets and property* with respect to such Claims or Equity Interests.[4]

(emphasis added).

As these injunctions permanently enjoin creditors from pursuing their claims and provides a discharge to non-debtor parties, this is impermissible under Section 524(e) of the Code. Section 524(e) of the Code provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Ninth Circuit has repeatedly reversed the granting of permanent injunctions against suing non-debtors on the basis that the prohibited permanent relief had the effect of releasing non-debtor parties from liability. *See American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621 (9th Cir. 1989); *see also Resorts Intl v. Lowenschuss (In re Fred Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995).

As the SAP contains these impermissible releases and injunctions, the SAP should not be confirmed.

### E. The SAP Improperly Classifies Their Interests

The SAP must classify interests properly. The Bankruptcy Code specifies that claims or interests within a given class must be "substantially similar." 11 U.S.C. §

---

[4] The language of this portion of Section 5.6 also remains unchanged, though 5.6 does include a new paragraph at the end allowing TAB Bank and/or potentially others from pursuing claims against non-debtor persons relating to a PPP loan.

1122(a). Courts have clarified that substantially similar claims can only be classified separately if there is a "legitimate business or economic justification" for doing so. *Barakat v. Life Ins. Co. of Va. (In re Baraket)*, 99 F.3d 1520, 1524-1525 (9th Cir. 1996). Notably, courts have not required that such interests be identical, only "substantially similar."

Here, Equity Holders and the other common shareholders have been classified as Class 5, separate and apart from Class 4, which consists of Series A preferred stock equity interests. There is no justification for this separate classification as the interests held by the two classes are substantially the same. Indeed, it appears that the truly material difference between the two classes in the Debtor's eyes are who belongs in each class. One class, the class which will continue forward under the SAP with equity in the company is full of insiders and LVP's preferred shareholders. The other class, the one to which Equity Holders belong, is populated mostly with corporate outsiders who were brought into the company by Debtor's ousted founder.

The SAP provides no basis for classifying common shareholders differently from holders of preferred stock. Indeed, the SAP provides at section 9.46 that "Equity Interest" is defined as "[a]n ownership interest in the Debtor, including the Common Equity Interests, the Series A Preferred Stock, or rights or interests linked to the same or any other ownership interests in the Debtor, including options, warrants, or other agreements or rights to acquire the same."[5]

Similarly, the Debtor's corporate charter provides that "the holders of Preferred Stock shall vote together, and not separately as a class, with Common Stock and all other shares of stock of the Corporation having general voting power." (Exhibit B to Gandhi Suppl. Decl. [Dkt. No. 151-1] at § B.3).

In the Supplemental Declaration of Rahul Gandhi, Debtor provides the only purported justification for the separate classes. Gandhi claims that the classes are

---

[5] This definition remains unchanged from the Amended Plan. *See* Dkt No. 172.

OBJECTION TO CONFIRMATION OF 2ND AMENDED PLAN OF REORGANIZATION
- 12 -
Case: 20-30365   Doc# 195   Filed: 10/22/20   Entered: 10/22/20 19:18:34   Page 12 of 16

appropriate as the holders of the preferred stock are to receive a priority distribution in the event of liquidation and have a right to a cash redemption on a future date. (Gandhi Suppl. Decl. ¶¶ 10-11). A Chapter 11 case, such as here, is obviously intended to be an alternative to avoid liquidation. Thus, the preferred stockholders right to receive a priority distribution in the event of a liquidation event is immaterial in the present circumstances. Similarly, the preferred stockholders only have a right to cash distribution at specified times. At this time, such triggering events have not occurred, and the preferred stockholders do not have a current right to a cash redemption. Thus, presently, the rights of the preferred stockholders are "substantially similar" to those of Equity Holders and other common shareholders.

Quite simply, the Debtor has not demonstrated any reasonable economic or business justification for treating the interests of Equity Holders and the other common shareholders differently than the holders of the preferred stock.

Further, courts have consistently warned and advised against allowing debtors to classify similarly situated interests differently in order to gerrymander an affirmative vote on a reorganization plan. *Phoenix Mut. Life. Ins. Co. v. Greystone III Joint Venture (In re Greystone III)*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("one clear rule that emerges from other muddled case law on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan") (*cert. denied.* 506 U.S. 821 (1992)); *Barakat*, 99 F.3d at 1526 (agreeing with *Greystone III* in holding that "absent legitimate business or economic justification, it is impermissible" to classify similar claims separately in order to gain acceptance of a reorganization plan.).

No legitimate economic or business justification exists for the disparate classification of Equity Holders and the other commons shareholders from other equity interests in the company. The separate classification is improper and the SAP should not be confirmed.

### F. The SAP Was Not Proposed in Good Faith

Section 1129(a)(3) requires that a plan for reorganization be "proposed in good faith." 11 U.S.C. § 1129(a)(3). "Bankruptcy courts should determine a debtor's good faith on a case-by-case basis, taking into account the particular features of each . . . plan." *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 (9th Cir. 1982); *see also, Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 352 n.2 (B.A.P. 9th Cir. 1997) (stating that "the law in the Ninth Circuit is . . . that the determination of good faith must be based on the totality of the circumstances").

Other bankruptcy courts have found that plans were not proposed in good faith where they primarily sought to protect or increase the equity of insiders. *See In re GAC Storage Lansing, LLC,* 485 B.R. 174, 200-201 (Bankr. N.D. Ill. 2013) (finding plan was not proposed in good faith where insider insisted on new equity contribution foreclosing potential larger contributions from third-parties). Bankruptcy Courts have also found lack of good faith where the debtor entered into non-arm's length transactions with insiders in an apparent attempt to thwart the rights of outsiders through the bankruptcy process. *See In re Autterson,* 547 B.R. 372, 399-400 (Bankr. Colo. 2016) (finding plan was not proposed in good faith where pre-petition conduct and the plan itself seemed focused on protecting insiders at the expense of other interests).

Here, Debtor's pre-petition conduct and the SAP clearly evidence an intent to not only protect insiders at the expense of other interests, but to actually allow such insiders to obtain greater equity in Debtor. The Pre-Petition Insider Bridges Financing was clearly formulated so that insiders would have substantial secured claims in an effort to justify completely extinguishing Equity Holders and the other common shareholders' equity in Debtor. Furthermore, Debtor has offered no economic or business justification for why it is necessary to completely wash away the common shareholders' interest in Debtor. Indeed, as noted elsewhere in this objection, one of the primary benefits of filing a petition under Subchapter V is to allow equity holders

to maintain their interest in the company. Debtor has offered no good faith justification as to why it believes it is necessary to deny Equity Holders and the other common shareholders an ability to continue forward with equity in Debtor.

**G. It Would Be Proper Exercise of Court's Equitable Powers to Prevent Bad Faith Extinguishing of Equity Holders' Interests**

As courts of equity, bankruptcy court have broad equitable powers to ensure that the purposes of the Bankruptcy Code are properly employed. *See Beaty v. Selinger (In re Beaty),* 306 F.3d 914, 922 (9th Cir. 2002) ("a bankruptcy court is a court of equity and should invoke equitable principles and doctrines, refusing to do so only where their application would be 'inconsistent' with the Bankruptcy Code"). Indeed, Section 105 empowers a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to . . . prevent an abuse of process." 11 U.S.C. § 105(a).

Here, it would be inequitable and unjust to allow the SAP to completely extinguish Equity Holders and the other common shareholders' interest in Debtor. The Equity Holders and the other common shareholders helped to build Debtor's product by being early investors in an unproven idea and company. It would be completely inequitable to allow Debtor through the SAP to completely wipe out Equity Holders' interest in the company now when the company is on the verge of *finally* realizing actual revenue. Indeed, one of the purposes behind Subchapter V of Chapter 11 is to allow a debtor to reorganize without having to extinguish equity holders' interests in their companies. *See In re Easter*, 2020 Bankr. LEXIS 2830 at *11 (noting important distinction of Subchapter V is "the elimination of the absolute priority rule, which allows equity holders to retain their ownership interests without paying all creditors in full.").

This is especially true here where Equity Holders' and the other common shareholders' interests in the Debtor are being extinguished to allow corporate insiders and LVP's preferred investors to acquire a larger stake in Debtor. The Court should not allow such bad faith intentions to prevail.

## IV.
## CONCLUSION

For the foregoing reasons, the Court should sustain Equity Holders' objections as raised above and in their previous formal and informal objections. The SAP should not be confirmed.

Dated: October 22, 2020          NELSON COMIS KETTLE & KINNEY


By: _/s/ Keith H. Fichtelman_____
    Keith H. Fichtelman

Attorneys for Paras Bhende, Vikram Namjoshi and Masoud Toghraie